(96 N. W. Rep. 305.)

---

STATE EX REL BOARD OF UNIVERSITY AND SCHOOL LANDS *v.* McMILLAN, STATE TREASURER.

Opinion filed August 6, 1903.

**Grant of Land to the State by Congress, for Educational Purposes, Is a Trust to Which the Faith and Honor of the State Is Pledged.**

1. The lands granted to this state by congress for educational purposes, and the proceeds of the sale thereof, constitute a permanent trust fund, the interest and income of which alone may be used by the state, and then only for the support of such schools as are designated

by the enabling act and the state constitution; and to the maintenance of the permanent trust fund and the faithful administration of the trust the faith and honor of the state is pledged.

### Normal School Not a School Corporation. Its Board Can Only Contract Debts From Legislative Appropriation, and Such Debts Are State Debts.

2.  The state normal school at Valley City is not a school corporation, or a legal entity. It is merely one of the instrumentalities of the state, through which it promotes its educational interests. The power of its trustees to contract debts is limited by legislative appropriations, and, when contracted, such debts are debts of the state.

### Constitution Restricts Investment of School Fund to Four Classes.

3.  Section 162 of the state constitution restricts the board of university and school lands to four classes of securities as investments for the permanent school fund, one of which is "bonds of the state of North Dakota." The state obligations designated by this section as "bonds of the state of North Dakota" include only such state bonds as are valid and constitutional within the constitutional debt limit, and so certified by the state auditor and the secretary of state, and the payment of which is secured by a provision for an irrepealable tax levy in the act authorizing their issuance.

### Chapter 49, p. 54, Laws 1903, Is Unconstitutional.

4.  Chapter 49, p. 54, Laws 1903, which authorizes the issuance of $60,000 in bonds for the purpose of procuring funds to erect and equip buildings for the state normal school at Valley City, and appropriates a sufficient portion of the interest and income dedicated to the support of that institution to repay the principal and pay the interest on the sum so borrowed, is unconstitutional and void for the following reasons: (1) It authorizes the creation of a state debt in excess of the state debt limit, in violation of section 182 of the state constitution; (2) it authorizes the creation of a state debt and does not provide for a tax levy to pay the principal and interest, as required by said section; (3) it diverts the interest and income dedicated to the support of this institution to the payment of a state debt, in violation both of the enabling act and of the state constitution.

### Bonds Issued Under Such Act Are Void.

5.  Under the authority of this act bonds to the amount of $60,000 were issued, and the same were purchased by the board of university and school lands as an investment for the permanent fund belonging to the common schools. It is *held,* on an application to compel the state treasurer to pay a warrant drawn for the purchase price of said bonds, that said bonds are void because of the invalidity of the act authorizing their issuance, and for the further reason that they are not certified to be within the debt limit, as required by section 187

of the constitution, and that in refusing to pay said warrant the state treasurer acted in accord with his legal duty as the custodian of the trust fund.

Original application for mandamus by the state of North Dakota, on the relation of the Board of University and School Lands, against D. H. McMillan, as state treasurer.

Writ denied.

*Newman, Spalding & Stambaugh,* for defendant.

The act of the legislature authorizing the issue of the bonds in question is unconstitutional and void, being in conflict with section 159 of constitution, in that it diverts a portion of the funds inviolably appropriated and applied to the support of the normal school, to the payment of interest and discount. It is immaterial that the interest is only four per cent, or that there is no danger of the bonds being sold at a sacrifice. If the power to dissipate the fund exist, it is unlimited. *Newell* v. *People,* 7 N. Y. 9.

The act is also in violation of section 11 of the Enabling Act. The state took the fund as a trust for the sole purpose of expending its income for "the support of the schools," and not to divert it to the payment of interest and discount on borrowed money. The state is trustee and its power must be strictly construed in favor of the United States and against the state.

*Rice* v. *Minnesota & Northwestern R. R. Co.,* 66 U. S. 358, 17 Law. Ed. 147; *Ohio Life Ins. & T. Co.* v. *Debolt,* 16 How. 435, 14 L. Ed. 1005; *Ashburner* v. *People of the State of California,* 103 U. S. 575, 26 L. Ed. 415; *Cornell University* v. *Fiske,* 136 U. S. 152, 34 L. Ed. 427; *State* v. *Ruth,* 68 N. W. Rep. (S. D.) 190.

The position that the state is powerless to carry out the mandate of the constitution, to establish a system of free public schools throughout the state, "beginning with the primary and extending through all grades up to and including the normal and collegiate course," is untenable. It is true the constitution restricted the power of taxation, but it has placed a limitation upon the restriction. For twelve years the state has proceeded upon the theory that the restriction did not apply to money raised for school purposes and has levied two mills on the dollar for the support of common schools; and for two years pursued the same course with regard to higher institutions. The legislature was left with a free hand; it was to sustain a system of free public schools, from

primary up, in a uniform manner by a general state tax, and not on a four mill levy, which should besides, supply the "expenses of the state government."

The purpose for which the bonds were issued involves the use of the income of the permanent school fund for a purpose in conflict with section 11 of the Enabling Act and with section 159 of the constitution. The act provides "a fund for the erection and equipment of additional buildings and other needed improvements." The bonds are to be paid from the income of that portion of the "permanent school fund" belonging to that school; while section 11 of the Enabling Act provides that such "income shall be expended in the *support* of said school." Section 159 of the constitution shall provide that it "shall be inviolably appropriated and applied to the specific objects of the original grant." The purpose of the act is the support of the normal school. The word "support" does not include erection and equipment of buildings, and the making of improvements. Support does not mean create; it implies the previous existence of the thing supported. In early acts of congress making similar grants, the word "use" had a broader significance. The words "for the use of the institutions" cannot warrant the employment of funds "in the erection of buildings." *Mitchell et al.* v. *Colgan,* 54 Pac. 905 (Cal.). The building of new school houses and purchase of sites do not come within the well defined exception of "support of common schools." Sheldon v. *Purdy,* 49 Pac. 228.

The act is unconstitutional and void, and the bonds issued under it void, so far as they create a contingent liability of the state for the payment of any portion of the interest thereon.

The state is the guarantor of the interest. The appropriation is void, in that it diverts taxes levied for other purposes to the payment of such interest. Under existing laws, there can be no "unappropriated" funds in the treasury. The tax levy must be based upon the aggregate of appropriations, permanent and temporary, and cannot exceed that sum. *Houghton* v. *Austin,* 47 Cal. 646; *Savings and Loan Association* v. *Austin,* 46 Cal. 416. The tax must be preceded by a law authorizing it, and stating the purposes to which it shall be applied, and the amount of the tax must necessarily be determinable before the tax can be lawfully levied. Section 175, Constitution.

The provision in question attempts to appropriate the money, without a levy of a tax to meet the appropriation. The amount of tax necessary cannot be levied,· until a specific appropriation of .a definite sum is made for the purpose, and the amount necessary for the purpose cannot be determined until the payment is due. But if the act is insufficient as an appropriation, the state must ·enact further laws to pay the deficiency of interest. The obligation is precisely the same as to pay any other debt. But it is conceded that the state debt already equals the constitutional limit. 'The obligation is, therefore, forbidden by the constitution. Section 182 Constitution.

The school fund cannot be invested in obligations of the state ·in excess of debt limit. *Re Loan of School Funds,* 32 Pac. 273, *Newell* v. *People,* 7 N. Y. 9.

The state treasurer may in his discretion refuse to pay any war-·rant that he is satisfied is drawn for an unlawful purpose, and it is always a sufficient answer in a mandamus proceeding for him ·to establish such unlawful purpose.

*Bailey* v. *Lawrence Co.,* 51 N. W. Rep. 331; *Keller* v. *Hyde,* 20 ·Cal. 594, High Ex. Leg. Rem. sections 354 and 360. *Dempsey* v. *Board,* 20 S. E. Rep. 811; *State* v. *Yeatman,* 22 Ohio St. 546; .*State* v. *Langlie,* 5 N. D. 594, 67 N. W. Rep. 958; *State* v. *Heard,* 18 So. Rep. 746; *First National Bank of Topeka* v. *Hefflebower* .*State Tr.,* 51 Pac. 225; *Wilson* v. *Bradley,* 48 S. W. Rep. 166; *State ex rel. Wiles* v. *Albright,* 11 N. D. 22, 88 N W. Rep. 729.

*C. N. Frich,* attorney general, and *Guy C. H. Corliss,* for re-·lators.

Section 156 of the constitution makes certain officers the Board ·of University and School Lands, and declares that such board shall have control of such lands, and direct the investment of the funds arising therefrom, in the hands of the state treasurer. The legal control of the funds is in this board, and the treasurer is the mere custodian of the uninvested money. The treasurer is merely a trustee. The board has absolute control over the fund ·with power to invest the same; when it has decided upon an investment, directed the auditor to draw a warrant, the duty of the ·treasurer is simply unescapable. He must pay the warrant. The treasurer cannot set up his judgment as to the legality of a con-·templated investment as against the judgment of the board, when

the law has entrusted such matter to the board's control. An officer is protected in executing a process fair on its face, although he may know facts outside of the process that render it void.

*Webber & Hand* v. *Gay & Eysamen,* 24 Wend. 485; *The People* v. *Warren,* 5 Hill. 440; *Watson* v. *Watson,* 9 Conn. 140; *Taylor* v. *Alexander et al.,* 6 Ohio 147; *Wall* v. *Trumbull,* 16 Mich. 234; *Erskine Collector,* v. *Hohnbach,* 14 Wall. 613, 81 U. S. 1570, 20 L. Ed. 745; *Orr* v. *Box,* 22 Minn. 485; *Brown* v. *Harris,* 52 Mo. 306; *The Mayor, etc., of City of Jefferson to use of Pacific R. R.* v. *Opal et al.,* 49 Mo. 190; *Stutsman County* v. *Wallace,* 142 U. S. 293, 12 Sup. Ct. Rep. 227; *Harding* v. *Woodcock,* 137 U. S. 43, 11 Sup. Ct. Rep. 6; *Wilmarth* v. *Burt,* 7 Metc. 257, 23 Am. & Eng. Enc. L., 379; Mechem on Public Officers, sections 768, 769; Throop on Public Officers, section 759; *Thurston* v. *Martin,* 5 Mason 300.

A ministerial officer cannot be held liable in such a case, where the precept or order under which he acts comes to him from the proper source, and is within the apparent authority of the body or officer issuing it.

*Savacool* v. *Boughton,* 5 Wend. 170; *Bennet* v. *Burch,* 1 Denio 141; *Abbott* v. *Yost,* 2 Id. 86; *Sheldon* v. *Van Buskirk,* 2 N. Y. 477; *Watson* v. *Watson,* 9 Conn. 140; *Prince* v. *Thomas,* 11 Id. 472; *Neth* v. *Crofut,* 30 Id. 580; *Fox* v. *Wood,* 1 Rawle 143; *Waldron* v. *Lee,* 5 Pick. 323; *Donahoe* v. *Shed,* 8 Metc. 326; *Slomer* v. *Peo,* 25 Ill. 70; *Hill* v. *Figley,* Id. 156; *Dwinnels* v. *Boynton,* 3 Allen 310.

If the officer had knowledge of facts outside of his certificate it would not affect the rule of protection.

*Watson* v. *Watson,* 9 Conn. 140; *Wilmarth* v. *Burt,* 7 Metc. 257; *Brainard* v. *Head,* 15 La. Ann. 489; *Peo* v. *Warren,* 5 Hill. 440; *Brown* v. *Harris,* 52 Mo. 306; *Barr* v. *Combs,* 45 Pac. Rep. 776; *Erskine* v. *Hohnbach,* 14 Wall. 613, 81 U. S. 570, 20 L. Ed. 745; *Tyler* v. *Cass County,* 1 N. D. 369, 48 N W. Rep. 232; *Stutsman County* v. *Wallace et al.,* 142 U. S. 293, 12 Sup. Ct. Rep. 227; *State* v. *Obert,* 36 Pac. Rep. 64, 23 Am. & Eng. Enc. Law (2d Ed.) 379.

The bonds are bonds of the state within the meaning of section 162 state constitution, and proper securities in which to invest the school fund.

The debt created by the issue of these state obligations is not within the prohibition of section 182 of the constitution. The debt contemplated by this section is one that must be met by general taxa-

tion. The meaning of this provision of the constitution is, that there shall be no state indebtedness in excess of $200,000, to pay the principal and interest of which a state levy of taxes shall be necessary. The bonds issued by the trustees of the Normal School could never become a state debt in the sense of the constitution, for the taxable property of the state can never be held liable for their payment. They are payable from the interest and income fund accumulating from the sale, rental or lease of lands granted to the Normal Schools. The interest and income accumulating from the sale, rental or lease of such lands is amply sufficient to pay the interest, and create a sinking fund to extinguish the principal, during the time that bonds are to run, and their payment can in no event burden the taxpayers of the state.

The authorities are unanimous that no debt is created, within the meaning of the constitutional prohibition fixing a debt limit, unless the municipality or state enters into an obligation, which becomes a charge on its taxable property to be enforced by a general tax levy. *City of Clinton* v. *Walliker,* 68 N. W. Rep. 431; *Tuttle* v. *Polk,* 60 N. W. Rep. 734; *Fort Dodge Elec. etc., Co.* v. *City of Fort Dodge,* 89 N. W. Rep. 7; *Kelly* v. *City of Minneapolis,* 65 N. W. Rep. 115; *Quill* v. *City of Indianapolis,* 23 N. E. Rep. 788, 7 L. R. A. 681; *Swanson* v. *Ottumwa,* 91 N. W. Rep. 1048; *Davis* v. *City of Des Moines,* 32 N. W. Rep. 470; *Baker* v. *City of Seattle,* 27 Pac. Rep. 462; *Little* v. *City of Portland,* 37 Pac. Rep. 911; *Salem Water Co.* v. *City of Salem,* 5 Ore. 29; *Koppikus* v. *Commissioners,* 16 Cal. 248; *People* v. *Pacheco,* 27 Cal. 175; *City of East St. Louis* v. *Flannigan,* 26 Ill. App. 449; *Faulkner* v. *City of Seattle,* 53 Pac. 365; *Winston* v. *City of Spokane,* 41 Pac. Rep. 888; *Addyston Pipe & Steel Co.* v. *City of Corry,* 46 Atl. Rep. 1035.

A contingent liability is not within the meaning of the constitution fixing the debt limit. *Fort Dodge etc.* v. *Fort Dodge,* 89 N. W. Rep. 7, and cases cited.

YOUNG, C. J. Upon the petition of the members of the board of university and school lands an alternative writ of mandamus was issued by this court directed to D. H. McMillan, as state treasurer, and commanding him to pay a certain warrant for $60,000 drawn upon him by the state auditor, and payable to the treasurer of the Valley City normal school or show cause why he has not done so. The warrant is payable out of that portion of

the permanent school fund dedicated by the enabling act and the state constitution to the support of the common schools, and was drawn to pay the purchase price of certain "bonds of the state Normal School at Valley City," purchased by said board as an investment for the fund upon which the warrant was drawn. The bonds were authorized by and issued under chapter 49, p. 54, Laws 1903. It it not questioned that there was and is a sufficient sum of money in the treasurer's hands belonging to said fund to cover the warrant. The treasurer's refusal to pay is based entirely upon the contention that the board is without legal authority to invest this fund in the kind of obligations proposed as an investment, and, as a consequence, he cannot, as the constitutional custodian of the fund, legally pay the warrant. The allegations of the petition embodied in the writ are as follows:

"Thet petition of the superintendent of public instruction, the governor, attorney general, secretary of state, and state auditor of the state of North Dakota, constituting, under section 156 of the state constitution, the board of university and school lands, respectfully shows to the court: (1) That the defendant is the duly elected, qualified, and acting treasurer of this state. (2) That under the provisions of chapter 49, p. 54, Laws of 1903, entitled 'An act authorizing the board of trustees of the state normal schools to issue bonds to provide a fund for the erection and equipment of necessary additional buildings and for other improvements for the normal schools at Valley City and Mayville,' the board of trustees of the State Normal School at Valley City issued bonds to the amount of sixty thousand dollars, which bonds were issued under the seal of the board of trustees of the said State Normal School, and were signed by its president and secretary. That they were in denominations of two thousand dollars each, and were to draw interest at the rate of four per cent per annum, payable annually. (3) That said bonds were offered for sale to the board of university and school lands at par, and that the said board of university and school lands decided to purchase the said bonds as an investment for that portion of the permanent school fund dedicated by the enabling act and Constitution to the support of the common schools. That there was then on hand belonging to the said fund, in the hands of this defendant, as state treasurer, the sum of $322,-413.44. (4) That in pursuance of said resolution to purchase said bonds, and for the purpose of consummating said purchase, the

board of university and school lands duly authorized the state auditor to draw his warrant on the defendant, as such state treasurer, payable out of the said fund, and that said warrant was, by the state auditor, drawn on the defendant, as such state treasurer,. payable out of the said fund for the purchase of the said bonds, and was, previous to delivery thereof, duly registered by the state treasurer in a book provided for that purpose. That the said warrant on this defendant, as such state treasurer, was payable to the treasurer of said State Normal School at said Valley City, N. D., and was duly presented to the defendant, as such state treasurer,. for payment, but that defendant refused to honor said warrant,. or to pay out any moneys thereon, assigning as the sole and only reason for such refusal that the said contemplated investment of said fund in said bonds is not authorized by the Constitution of the state of North Dakota, but is unlawful. (5) That at the time of the sale of the said bonds, and at all times subsequent to January 1, 1903, the interest and income accumulating from the sale, rental,. or lease of the lands granted to the said normal school were sufficient to pay the interest upon the said bonds for sixty thousand dollars, and also for the creation, in addition thereto, of a sinking fund with which to pay said bonds at maturity, and that the interest. and income accumulating from the sale, rental, or lease of the said. lands will continually increase for some years to come, so that not only will the said interest and income be adequate to the payment of the interest on said bonds at all times, but that the surplus of said interest and income, which must be used for the purpose of creating said sinking fund, will be larger each year for some years. to come, and that from said surplus a sinking fund more than sufficient to discharge the said bonds at maturity will be created. (6) That ever since January 1, 1903, the debts of the state of North Dakota (within the meaning of section 182 of the Constitution) have been equal in the aggregate to the sum of two hundred thousand dollars, exclusive of the indebtedness of the state of North Dakota at the time of the adoption of the said Constitution; and that, if the said bonds for sixty thousand dollars, so sold by the board of trustees of the said normal school to the board of university and school lands, create a state indebtedness, within the meaning of said section 182 of the Constitution,. they would exceed the debt limit fixed by said section, and would be void. (7) That said bonds so issued as aforesaid are ready

for delivery. That said, proposed investment is authorized by the Constitution.

The defendant, in his return, admits that there is in his hands the sum of $322,413.44, belonging to that part of the permanent school fund dedicated to the support of the common schools, and subject to investment as alleged by the relators. Defendant alleges that he has no knowledge or information sufficient to form a belief whether the interest and income accumulating from the sale, rental, or lease of the Valley City Normal School lands will continually increase, or as to whether said interest and income would be adequate to the payment of the interest on said bonds at all times, or whether said interest and income will be sufficient to provide a sinking fund for the payment of the principal of said bonds at maturity, and alleges that: "In the year 1891 said normal school at Valley City issued bonds of the same character as those described in said petition, which were payable, principal and interest, out of the interest and income accumulating from the sale, rental, or lease of the lands granted to the said normal school; and that said interest and income is not sufficient to pay the interest of said bonds, issued as aforesaid, for the sum of twenty thousand dollars, and to create a sinking fund therefor, as provided by the act authorizing such issue, and to pay the interest on the said sum of sixty thousand dollars and create a sinking fund as aforesaid by the act authorizing the issue thereof; and that at its session in the year 1903 the legislature passed 'An act authorizing the State Board of Equalization to include in the annual levy for bond interest and bond sinking fund a sufficient amount to pay the interest and provide a sinking fund for the state normal school bonds issued under the provisions of section 10, chapter 89, Session Laws of 1891,' for the purpose of creating a fund to meet the deficiency of said principal and interest, and this defendant has no knowledge or information other than the facts stated in said act with reference to the sufficiency of said interest and income to pay the interest on said bonds and create a sinking fund for the payment of the principal thereof."

Defendant further alleges that the bonds in question are not bonds of the state of North Dakota, but are "bonds of the State Normal School at Valley City." A copy of one of said bonds is attached to the answer as an exhibit, and is as follows:

"United States of America.
"Number 1.
"State of North Dakota.

"$2,000.00                                    $2,000.00
"Bonds of the State Normal School at
Valley City.

Bismarck, N. D., May 1, 1903.

"Know all men by these presents, that the board of trustees of the state normal schools of the state of North Dakota, for the Normal School at Valley City, acknowledges itself indebted and for value received hereby promises to pay to the state of North Dakota or bearer, the sum of two thousand dollars on the first day of May, A. D. 1904, together with interest on said sum from the date hereof until paid at the rate of four per centum per annum, payable annually on the first day of July of each year, upon presentation and surrender of the interest coupons hereunto attached as they severally become due. Both principal and interest are payable at the office of the state treasurer, in the city of Bismarck, state of North Dakota.

"This bond is one of a series of thirty bonds, numbered consecutively from one to thirty inclusive, each of like amount, becoming due on the first day of May of each succeeding year for thirty years, and is issued by the board of trusteees of the state normal schools of the state of North Dakota for the State Normal School at Valley City, for the sole purpose of providing funds for the erection and equipment of necessary additional buildings, and for other necessary improvements for the State Normal School at Valley City. This bond is authorized by an act of the eighth legislative assembly, approved February 13th, 1903, and entitled 'An act authorizing the board of trustees of the state normal schools to issue bonds to provide a fund for the erection and equipment of necessary additional buildings and for other necessary improvements for the normal schools at Valley City and Mayville.'

"In witness whereof, the board of trustees of the state normal schools of the state of North Dakota has caused this bond to be signed by the president of said board, and to be attested by the secretary, and has caused the seal of said board to be hereunto affixed this 1st day of May, A. D. 1903.

"[Seal.]                               W. L. Stockwell, President.
"Attest: E. J. Taylor, Secretary."

The act (chapter 49, pp. 54, 55, Laws 1903) under which the bonds were issued, is printed on each bond, and is as follows:

"An act authorizing the board of trustees of the state normal schools to issue bonds to provide a fund for the erection and equipment of necessary additional buildings and for other necessary improvements for the normal schools at Valley City and Mayville.

"Section 1. The board of trustees of the state normal schools, in order to provide a fund for the erection and equipment of the necessary additional buildings and other needed improvements at the normal schools at Valley City and Mayville are hereby authorized and empowered to issue bonds for such sum or sums of money as is actually needed for the purposes herein specified not exceeding sixty thousand dollars for each of said normal schools.

"Sec. 2. Said bonds shall be designated as the 'Bonds of the State Normal School at Valley City' and 'Bonds of the State Normal School at Mayville.' They shall be issued under the seal of the board of trustees of the state normal schools and signed by its president and secretary. They shall be in denominations of two thousand dollars each, shall bear four per cent interest and shall mature at such times as may be deemed advisable by said board of trustees and in not to exceed thirty years.

"Sec. 3. The interest shall be paid annually on the first day of July from the interest and income accumulating from the sale, rental, and lease of the lands granted by the state to the respective state normal schools; provided if there shall not be sufficient money in each of said funds to pay such interest there is hereby appropriated a sufficient amount to meet such deficiency.

"Sec. 4. The state treasurer is hereby authorized and required to retain out of the interest and income fund of each of said normal schools each year, first a sufficient amount to pay the annual interest upon the bonds issued for the benefit of the respective normal schools, and second, for the sinking fund to be used to pay off the bonds as they mature, an amount equal to one-thirtieth of the total of the bonds issued for the benefit of the respective normal school. He is further authorized and required to pay over and transfer quarterly to the maintenance fund of the respective normal schools any and all balances there may be remaining in said interest and income fund over and above the reservations above provided for.

"Sec. 5. These bonds shall first be offered for sale to the board of university and common school lands at par, and if not purchased

by said board the board of trustees of state normal schools shall receive sealed proposals for the purchase of the same, and shall give public notice of the sale for at least thirty days preceding such sale, and the bonds shall be sold to the highest bidder. The proceeds of such sale shall be delivered to the treasurers of the respective normal schools to be used exclusively in pursuance of the provisions of this act.

"Sec. 6. Emergency. Whereas an emergency exists in that the proceeds from the sale of these bonds will be needed before the first day of July in order that the buildings be completed before the opening of the next school year, therefore this act shall take effect and be in force from and after its passage and approval.

"Approved February 13th, 1903."

This case presents but a single question for determination. That question is whether the board of university and school lands may lawfully, under the enabling act and under the state Constitution, purchase these bonds as an investment for the permanent school fund. If it may lawfully do so, the treasurer's refusal to pay the warrant was without legal excuse, and he will be coerced by mandamus to pay the same. If, on the other hand, the board is without lawful authority to invest the permanent school fund in these securities, it will be conceded that the treasurer properly refused to pay the warrant, and the writ must be denied. While the question of the legality of the proposed investment is the decisive question in the case, its determination depends upon the solution of certain preliminary questions, namely, the character of the fund proposed to be invested, the limitations upon the authority of the board of university and school lands and of the legislature over the same, the constitutional limitations upon the power of the legislature to contract debts, and, finally, the character of the bonds proposed as investments.

The moneys which it is proposed to invest in these bonds constitute a part of the permanent fund derived from the sale of lands granted by Congress to this state upon its admission into the Union "for the support of common schools." Section 10 of the enabling act (Act Feb. 22, 1889, c. 180; 25 Stat. 676) granted "for the support of common schools" sections numbered 16 and 36 in every township in the state; and, where such sections or parts thereof had been sold or otherwise disposed of, provision was made that other lands equivalent thereto might be selected. The exact number

of acres covered by this grant is at present not known. As reported by the Land Department, it now amounts to 2,418,291 acres. In addition to the grant of land "for the support of common schools," Congress also granted to the state 668,080 acres for other purposes; making a total grant of 3, 086,371 acres. Of the 668,080 acres just referred to, 498,080 acres were apportioned by Congress in the enabling act, and for specific purposes named therein. The remaining 170,000 acres were granted to the state "for such other educational and charitable purposes as the legislature may determine." This apportionment was made by the Constitution. The entire grant of lands for all purposes, as divided by the enabling act and the Constitution, is as follows: Capitol buildings, 82,000 acres; State University, 86,080 acres; School of Mines, 40,000 acres; Agricultural College, 130,000 acres; Normal School, Valley City, 50,000 acres; Normal School, Mayville, 30,000 acres; Deaf and Dumb Asylum, 40,000 acres; Hospital for Insane, 20,000 acres; Soldiers' Home, 40,000 acres; Blind Asylum, 30,000 acres; Industrial School, 40,000 acres; Scientific School, 40,000 acres; Permanent School Fund, 2,418,291 acres—total, 3,086,371 acres. The grant of lands in aid of the common schools was supplemented by a further grant. Section 13 of the enabling act provides: "That 5 per centum of the proceeds of the sales of public lands lying within said states which shall be sold by the United States subsequent to the admission of said state into the Union, after deducting all the expenses incident to the same, shall be paid to the said states, to be used as a permanent fund, the interest of which only shall be expended for the support of common schools within said states respectively." Section 11 of the enabling act provides: "That all lands herein granted for educational purposes shall be disposed of only at public sale, and at a price not less than $10 per acre, the proceeds to constitute a permanent school fund, the interest of which only shall be expended in the support of said schools. But said lands may, under such regulations as the legislatures shall prescribe, be leased for periods of not more than five years, in quantities not exceeding one section to any one person or company; and such land shall not be subject to pre-emption, homestead entry, or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be reserved for school purposes only." It is entirely clear from the provisions of the enabling act just quoted that the entire grant of lands to the state for educational purposes

was in trust, and that the express terms of the grant require the state as trustee to maintain the permanency of the funds so granted; and further, that it limits the state to the use of the interest of the permanent fund, and requires that such interest shall be used "only for the support of 'schools.' "

We now turn to the provisions of the Constitution relating to the grant and the trust thereby imposed. Section 205 reads as follows: "The state of North Dakota hereby accepts the several grants of land granted by the United States to the state of North Dakota, by an act of Congress entitled 'An act to provide for the division of Dakota into two states, and to enable the people of North Dakota, South Dakota, Montana and Washington to form constitutions and state governments, and to be admitted into the Union on equal footing with the original states, and to make donations of public lands to such states,' under the conditions and limitations therein mentioned; reserving the right, however, to apply to Congress for modification of said conditions and limitations in case of necessity." Section 153: "All proceeds of the public lands that have heretofore been, or may hereafter be granted by the United States for the support of the common schools in this state; all such per centum as may be granted by the United States on the sale of public lands; the proceeds of property that shall fall to the state by escheat; the proceeds of all gifts and donations to the state for common schools, or not otherwise apppropriated by the terms of the gift, and all other property otherwise acquired for common schools, shall be, and remain a perpetual fund for the maintenance of the common schools of the state. It shall be deemed a trust fund, the principal of which shall forever remain inviolate and may be increased but never diminished. The state shall make good all losses thereof." Section 154: "The interest and income of this fund, together with the net proceeds of all fines for violation of state laws, and all other sums which may be added thereto by law, shall be faithfully used and applied each year for the benefit of the common schools of the state, and shall be for this purpose apportioned among and between all the several common school corporations of the state in proportion to the number of children in each of school age, as may be fixed by law, and no part of the fund shall ever be diverted even temporarily, from this purpose or used for any other purpose whatever than the maintenance of common schools for the equal benefit of all the people of the state; provided, however, that if any portion of the

interest or income aforesaid be not expended during any year, said portion shall be added to and become a part of the school fund." Section 155 prescribes the conditions upon which lands granted for the support of common schools may be sold, and also the time when they may be sold. Section 159: "All lands, money or other property donated, granted or received from the United States or any other source for a university, school of mines, reform.school, agricultural college, deaf and dumb asylum, normal school or other educational or charitable institution or purpose, and the proceeds of all such lands and other property so received from any source, shall be and remain perpetual funds, the interest and income of which, together with the rents of all such lands as may remain unsold, shall be inviolably appropriated and applied to the specific objects of the original grants or gifts. The principal of every such fund may be increased but shall never be diminished, and the interest and income only shall be used. Every such fund shall be deemed a trust fund held by the state, and the state shall make good all losses thereof." Section 160: "All lands mentioned in the preceding section shall be appraised and sold in the same manner and under the same limitations and subject to all the conditions as to price and sale as provided above for the appraisal and sale of lands for the benefit of common schools; but a distinct and separate account shall be kept by the proper officers of each of said funds: provided, that the limitations as to the time in which school land may be sold shall apply only to lands granted for the support of common schools."

Perhaps it is not necessary to state that by the acceptance of the grant for educational purposes—and it is with that grant we are concerned in this case—a trust was created, the character of which was fixed by the terms of the grant. By the mere acceptance of the grant the honor of the state was pledged to the observance of the obligation of the trust; that is, to maintain the permanency of the trust fund and to use the interest thereof only for the support of the several schools to which it was dedicated. There was no attempt on the part of the framers of the Constitution to shrink from this obligation, or avoid its restrictions. On the contrary, the Constitution declares and reiterates the declaration that all of the lands granted by Congress for educational purposes, including "all the proceeds of such lands, shall be and remain perpetual funds, the interest and income of which 'shall be inviolably appropriated and

applied to the specific objects of the original grants or gifts." They went further, and included grants for charitable purposes; declaring that all grants to the state for educational or charitable institutions or purposes, from whatever source, shall constitute a perpetual fund, "the interest and income of which shall be inviolably appropriated and applied to the specific objects of the original grants or gifts."

What we have said in reference to the limitations imposed by the enabling act and the Constitution upon the power of the legislature, has no application to what is known as the "capitol land grant." The funds derived from this grant are not required to be kept permanent; on the contrary, under the terms of the grant, they may be used at such times and in such manner as the legislature may determine. This grant was made expressly "for the purpose of erecting public buildings at the capitol, for legislative, executive and judicial purposes." Sections 12 and 17 of the enabling act. The only limitation upon the power of the legislature is that the proceeds of this grant shall be used for the purposes for which it was made, to wit, the erection of buildings at the state capital.

The people of the state were not content to merely declare the character and nature of the trust. They went further, and in plain language made provisions for its safe administration. Section 156 of the state Constitution provides: "The superintendent of public instruction, governor, attorney general, secretary of state and state auditor shall constitute a board of commissioners, which shall be denominated the 'Board of University and School Lands,' and, subject to the provisions of this article, and any laws that may be passed by the legislative assembly, said board shall have control of the appraisement, sale, rental and disposal of all school and university lands, and shall direct the investment of the funds arising therefrom in the hands of the state treasurer, under the limitations in section 160 of this article." Section 162: "The moneys of the permanent school fund and other educational funds shall be invested only in bonds of school corporations within the state, bonds of the United States, bonds of the state of North Dakota, or in first mortgages on farm lands in the state, not exceeding in amount one-third of the actual value of any subdivision on which the same may be loaned, such value to be determined by the board of appraisers of school lands." Section 165 of the state Constitution is as follows: "The legislative assembly shall pass suitable laws for the safe keep-

ing, transfer and disbursement of the state school funds; and shall require all officers charged with the same or the safe keeping thereof to give ample bonds·for all moneys and funds received by them, and if any of said officers shall convert to his own use in any manner ·or form, or shall loan with or without interest or shall deposit in his own name, or otherwise than in the name of the state of North Dakota, or shall deposit in any banks or with any person or persons, ·or exchange for other funds or property any portion of the school funds aforesaid, or purposely allow any portion of the same to remain in his own hands uninvested, except in the manner prescribed by law, every such act shall constitute an embezzlement of so much of the aforesaid school funds as shall be thus taken or loaned, or deposited, or exchanged, or withheld, and shall be a felony; and any failure to pay over, produce or account for the state school funds or any part of the same entrusted to any such officer, as by law required or demanded, shall be held and be taken to be *prima facie* evidence of such embezzlement." Thus it is seen that the people of this state, in their solicitude for a faithful administration of the trust, have removed the control of the trust fund from legislative control, and permanently lodged it with elective officers, towit, the superintendent of public instruction, governor, attorney general, secretary of state, and state auditor. Further, they have deprived the legislature, and the board as well, of the power of determining the kind of securities the trust fund shall be invested in, and for a dereliction of duty by the officers charged with the safe-keeping of the funds in any of the particulars named in section 165 they attached the punishment of a felony.

The spirit of public integrity which prompted the provision relating to the trust funds and their safe administration is equally manifest in the constitutional provisions relating to the creation of state debts. These provisions are controlling in this case. Section 182 reads as follows: "The state may, to meet casual deficits or failure in the revenue, or in case of extraordinary emergencies contract debts, but such debts shall never in the aggregate exceed the sum of $200,000, exclusive of what may be the debt of North Dakota at the time of the adoption of this Constitution. Every such debt shall be authorized by law for certain purposes to be definitely mentioned therein, and every such law shall provide for levying an annual tax sufficient to pay the interest semi-annually, and the principal within thirty years from the passage of such law, and shall

specially appropriate the proceeds of such tax to the payment of said principal and interest, and such appropriation shall not be repealed nor the tax discontinued until such debt, both principal and interest, shall have been fully paid. No debt in excess of the limit named shall be incurred except for the purpose of repelling invasion, suppressing insurrection, defending the state in time of war, or to provide for public defense in case of threatened hostilities; but the issuing of new bonds to refund existing indebtedness, shall not be construed to be any part or portion of said $200,000." Section 186: "No money shall be paid out of the state treasury except upon appropriation by law and on warrant drawn by the proper officer, and no bills, claims, accounts or demands against the state or any county or other political subdivision, shall be audited, allowed or paid until a full itemized statement in writing shall be filed with the officer or officers, whose duty it may be to audit the same." Section 187: "No bond or evidence of indebtedness of the state shall be valid unless the same shall have endorsed thereon a certificate, signed by the auditor and secretary of state, showing that the bond or evidence of debt is issued pursuant to law and is within the debt limit."

We now turn to the question whether the bonds here in question belong to any one of the four classes to which the people of the state, by section 162 of the state Constitution, have restricted the board for the purposes of investment. That they are not bonds of the United States is apparent. Neither are they first mortgages on farm lands. It only remains, then, to inquire whether they are bonds of a school corporation or bonds of the state of North Dakota; for, if they are not included within the two classes of securities last named, clearly they are prohibited investments. It must be admitted that these bonds are of such a nondescript character that it is difficult to classify them with any instruments with which we are familiar or to which our attention has been called. That they are not bonds of a school corporation is perfectly clear, and this is frankly conceded by counsel for the relator. The act provides that they should be designated as the "bonds of the State Normal School at Valley City," and further provides that they "shall be issued under the seal of the board of trustees of the state normal schools and signed by its president and secretary," instead of "under the great seal of the state by the governor and treasurer, and attested by the secretary of state," as is usual in acts authorizing the issuance of state bonds. See chapter 133, p. 307. Sess. Laws 1897; also

section 1355h, Rev. Codes 1899, and chapters 27, 46, pp. 31, 51,. Laws 1903. The act also requires the proceeds of the loan to be deposited with the treasurer of the normal school instead of with the state treasurer; further, the board of trustees is granted power,. within the limitations of the act, to determine the amount of the issue, and to fix the time when the bonds shall mature. These pro-- visions indicate a legislative intent to authorize bonds which would. constitute obligations of the normal school, and thus be "bonds of the state normal school" both in form and effect, and not bonds of' the state. That the board of trustees so interpreted the act is shown by the form of the bonds which they prepared and issued. The · copy of the bond above set out recites "that the board of trustees: of the state. normal schools of the state of North Dakota for the · Normal School at Valley City acknowledges itself indebted and for value received hereby promises to pay" the principal of the bond,. with interest. The character of the bonds, however, is not to be determined by provisions which relate to mere matters of form or-- to the manner of their execution, or to the name assigned to them by the legislature, but must be determined by those provisions of the · act authorizing their issuance, and upon which their validity rests, which go to the substance of the obligation. Judged by this test,. it will, we think, be readily seen that they are state obligations mas- querading in the name of "normal school bonds." This must be · true if they have any validity whatever, for bonds of the State · Normal School at Valley City are a legal impossibility. This insti- tution is not a school corporation or a legal entity. It cannot levy · and collect taxes; it owns no property; its trustees cannot contract· debts except within the limits of the appropriations made by the· legislature for its support; and when such debts are contracted they are not debts of the institution, but are the debts of the state. The · state is charged with its support and maintenance as one of the· educational institutions of the state. This institution and the other · state educational and charitable institutions are not legal and inde- pendent entities, but are mere agencies or instrumentalities through which the state promotes its educational and charitable interests, and for the support of which all of the taxable property of the state · is chargeable; and the power of their trustees to contract debts is limited. by legislative appropriations. As was said by the Supreme Court of Wisconsin in *State* v. *Mills,* 55 Wis. 229, 12 N. W. 359: "It cannot be said too emphatically, or repeated too often, that the vari--

-ous boards of trustees and managers of the benevolent and penal institutions of the state have no power to contract debts beyond the appropriation made by the legislature for the support and oper-ation of their respective institutions. A debt against one of these institutions is a debt against the state; and, if such boards could contract debts *ad libitum*, the constitutional limitations of state indebtedness to $100,000 (article 8, section 6) might become utterly inoperative. See *Sloan* v. *State*, 51 Wis. 623, 8 N. W. 393." See also, *Jewell Nursery Co.* v. *State*, 4 S. D. 213, 56 N. W. 113; *Weary* v. *State University*, 42 Iowa 335; *Neil* v. *Board*, 31 Ohio St. 15; *State ex rel.* v. *White*, 82 Ind. 278, 42 Am. Rep. 496. We therefore agree with counsel for the board that the "bonds in question are bonds of the state, or bonds of no one."

We now turn to the decisive question in the case, that is, whether these instruments are bonds of the state of North Dakota, and, of course, by that we mean valid and constitutional bonds, such as the board is authorized by section 162 to purchase as an investment for the permanent school fund. It is proper first to inquire—and the answer to this question is decisive of this case—whose obligation is evidenced by them. This question must be answered by the act authorizing their issuance. As we have seen, they are not the obligations of the normal school, for there is no such legal entity. It is apparent, therefore, that they evidence the obligations of the state, if they evidence any obligation whatever. That they are state obligations is, we think, entirely apparent, and for these reasons: First, the state authorizes their issuance; second, they are given for money borrowed by the state; third, the money to be procured from the loan is for state purposes—that is, to erect buildings for the state for one of its educational institutions; and, finally, the promise to repay the loan, both principal and interest, is made by the state. It is strenuously urged by counsel for the treasurer that "the instruments under consideration are not 'bonds' in any sense of the word, either as understood, when the Constitution was adopted, in financial exchanges and markets, or by the common people, or at common law, or under the statutes of this state; that they are merely contracts, whereby the board of trustees of the school, under the authority of the legislature, undertakes to hypothecate the income of the institution." What merit there may be in this contention we shall not undertake to determine. Of course, if the obligations in question are not bonds within the meaning of section 162 of the

state Constitution, they are prohibited investments, for that section restricts the board to investing in "bonds" of the state of North Dakota, and does not authorize the purchase of any other kind of state obligations. For the purposes of this case we shall assume that these instruments are bonds of the state of North Dakota, so far as the legislature had power to make them so, and shall direct our inquiry to the validity of the act authorizing their issuance. Is the act constitutional? This question must be answered unhesitatingly in the negative. It would seem that the invalidity of the bonds, and the unconstitutionality of the act upon which their validity rests, must be apparent to the legal mind as well as to the mind of the average layman from a mere statement of the constitutional provisions which we have previously quoted. It should require no argument to show that the act is invalid. Its violations of the following provisions of the Constitution are manifest: (1) It authorizes the creation of a state debt in excess of the debt limit and contrary to section 182 of the Constitution; (2) it authorizes the creation of a state debt, and contains no provision "for levying an annual tax sufficient to pay the interest semi-annually and the principal within thirty years," contrary to the requirements of the section last referred to; and (3) it appropriates for the payment of the principal and interest of a state debt the interest and income of the permanent fund of the normal school, which was dedicated to the support of said school by Congress and by the state Constitution, and thus diverts such interest and income from the purpose for which it was dedicated. Finally, the bonds themselves are invalid because the act authorizing them is invalid, and for the further reason that they are not certified by the auditor and secretary to be within the debt limit, as is essential to the validity of all state bonds under section 187, above quoted.

Whether the debt authorized to be created by this act is to meet a casual deficit or failure in the revenues of the state or to meet an "extraordinary emergency," so that its creation would be authorized in any event under the debt-limit section of the Constitution (section 172, before quoted), we do not determine. It is sufficient for the purposes of this case that the act authorizes a state debt in excess of the state debt limit.

We would rest the decision of this case at this point, were it not for the fact that thus far we have not considered the theory—and it is an ingenious one—upon which counsel for the board seeks to

sustain the legality of the proposed investment. Counsel broadly contends—and it is the only argument possible in support of the legality of the proposed investment—that the section of the Constitution which limits the state debt to $200,000, and requires every act authorizing the creation of a state debt to provide an annual levy to pay both principal and interest, and the section which requires as an essential prerequisite to the validity of a state bond that it shall be certified to be within the debt limit, have no application whatever to these instruments. He contends, first, that the instruments are "bonds of the state of North Dakota," and are, therefore, proper investments for the permanent school fund under section 162 of the state Constitution, which authorizes the investment of such fund in such bonds; and, second, that bonds issued under this act do not create a state debt. His argument is this: They are "bonds of the state"; therefore the board is authorized to buy them. They do not create a state debt; therefore the debt-limit section of the Constitution does not apply to them. Briefly stated, counsel contends that they are bonds of the state for the purpose of sustaining them as a constitutional investment of the permanent school fund under section 162, and contends they are not state bonds or evidences of a state indebtedness for the purpose of avoiding the condemnation of section 182, which limits state indebtedness to $200,-000. This contention cannot be sustained. The contention that the framers of the Constitution, and the people of this state when they adopted it, by authorizing the investment of the permanent school fund in "bonds of the state of North Dakota" (section 162), did not designate bonds of a particular kind, and that the term "bonds of the state of North Dakota" is general, and was intended to include all kinds of obligations which the ingenuity of subsequent legislatures might devise, regardless of the character or extent of the state's obligation to pay the same, finds no support in a single word or sentence of the Constitution. Indeed, such an interpretation of the Constitution does violence to its plain language. There is no ambiguity or obscurity of meaning in the several sections relating to the creation of state debts. The phrase "bonds of the state of North Dakota" imports a state debt. The common mind understands that it is a state obligation, a state debt, for the payment of which the faith and credit of the state is pledged; and it would be an insult to the intelligence of the framers of the Constitution and to the people of this state for this court to say that, when they

restricted the board of university and school lands to investing the permanent school fund in "bonds of the state of North Dakota," they did not in fact restrict them to state bonds such as, so far as their essential features are concerned, were known to the framers of the Constitution and to the people at that time; that is, bonds regularly issued, within the debt limit, and so certified, and the payment of which is secured by an irrepealable tax levy. If this argument of counsel be meritorious, it is equally applicable to the other classes of investments to which the Constitution restricts the board, and there is then in fact no restriction. If an investment in "bonds of the state of North Dakota" authorizes an investment in bonds other than those known when the Constitution was adopted, then "bonds of the United States" may be extended to include instruments entirely lacking in the essential elements of such bonds. "Bonds of school corporations" may include obligations wholly unknown to the framers of the Constitution, and "first mortgages on farm lands" may be extended to include instruments wholly devoid in their essential nature of the security which such obligations afford as known to the framers of the Constitution and to the people when they adopted it. This contention is, from its mere statement, manifestly unsound. Moreover, the contention that this act does not authorize the creation of a state debt, and that these instruments do not evidence a state debt, is utterly fallacious. It is argued that both the principal and interest of these bonds are to be repaid from a special fund—that is, from the interest and income fund of the state normal school—and that their payment is not, therefore, and cannot become, a charge upon the state or its taxpayers. With this as a premise, counsel contends that there is not state debt; that the debt is paid from a special fund, towit, the interest and income fund; and that the state's obligation is merely to appropriate this fund, and apply it to the payment of the bonds. A vast array of cases is cited which hold that bonds issued by a municipality for improvements payable solely out of special assessments upon property benefited are not within the debt limit provision. In such cases it is quite generally held that no debt is contracted by the municipality to be paid by it. The debt is to be paid by the property benefited; that is, from the funds of individuals, and not from the funds of the municipality. The loan in such cases is really to the owners of the property benefited. The municipality acts merely as an assessing and collecting agent. A full performance of the obligation

of the municipality under such a law involves it in no financial liability. The individual property owner who is benefited pays the debt. It is through a breach of its obligation, and not by a performance of it, that the municipality incurs a financial liability. There is no analogy between the principle upon which these cases are founded and the case at bar. Under the act here in question, the state itself is the borrower. It borrows for its own use, and it promises to repay the sum borrowed, with interest, and from its own funds. This act provides for payment by the state, and not payment by individuals, as in the case of special assessments. Sections 3 and 4 of this act appropriate from the interest and income fund dedicated to the support of the state normal school a sufficient sum to meet the obligations authorized, and, further, appropriate "out of any funds in the state treasury not otherwise appropriated" a sufficient amount to make the payment in case the interest and income is not sufficient. It requires no argument to show that this is a promise of the state to pay the principal and interest; and, as we shall hereafter see, it is a promise to pay out of state resources, and a promise which can only be discharged by a resort to taxation. The fact that all or a portion of the debt may be paid from the interest and income fund does not change the character of the obligation, or alter its effect upon the state. The important fact is that it is paid by the state. It is not important from what fund it is payable. That is a mere matter of bookkeeping. The payments, in either event, are made by the state, and from its resources. The result would be in every respect the same if all the payments were made directly from funds derived from general taxation, and the act would be open to no more constitutional objections than it now is if the disguise were removed, and it authorized the issuance of state bonds, recognizable in form and in substance as such, and requiring the levy of an annual tax, as required by section 182 of the Constitution. Without attempting to classify these instruments, it is entirely apparent that they evidence a state debt, every dollar of which, both principal and interest, must inevitably be repaid by a resort to general taxation. The theory is that the interest and income fund will pay these bonds and the interest on them, and that they cast no burden upon the taxpayer. Our answer is that the taxpayer is compelled to pay them.

In order that the answer to so vital a question may not rest upon a mere arbitrary assertion, we may be permitted to illustrate the

reasons for our answer from the practical operation of the several legislative acts which have adopted this plan. This scheme of financing state institutions had its origin in the legislature of 1891. Chapter 89, p. 246, Laws 1891, authorized the issuance of $40,000 bonds upon this plan; $20,000 for each of the normal schools. No further bonds were authorized until the session of 1901, when $120,000 were authorized and issued. See chapters 38, 127, and 173, pp. 48, 160, and 228, of the Session Laws of 1901. The plan has evidently grown in favor, however, for the recent legislature authorized the issuance of bonds payable upon this plan to the amount of $581,000. Now, it is assumed by counsel for the board that the obligation of these bonds will be met from the interest and income fund solely, and that no necessity can or will arise for a resort to the other funds of the state. The assumption that the interest and income fund will pay the obligations as they mature may be unwarranted, in view of the history of the loan of $20,000 made for the benefit of this institution in 1891, and payable upon this plan. The recent legislature, prior to the passing of the act authorizing the present $60,000 issue, passed an act (chapter 125, p. 165, Laws 1903) declaring, in effect, that the former $20,000 issue should therefore constitute a state debt, requiring the interest and principal of that loan to be paid from general taxation, authorizing a state levy for that purpose, and reciting in the act that the interest and income was not sufficient to pay the interest and principal upon the $20,000 and upon the proposed issue of $60,000. It may be said that this recital was true in point of fact. During the twelve years prior to that time there had been paid by the state treasurer upon the interest on this loan the sum of $14,400. But $2,400 of this sum was paid directly from the interest and income fund. The remaining $12,000 was paid from other state funds, which were derived directly from taxation. Under the terms of the repudiating act above referred to, there is no pretense that any further portion of the interest or principal of the 1891 loan will be paid from the interest and income fund, for the act requires that the remaining eight years' interest and the entire principal shall be repaid by general taxation. It may, therefore, well be doubted whether the proposed issue of $60,000 authorized by the act under consideration can be met from the interest and income fund. It is true this fund has recently increased, and necessarily will largely increase in the future; but whether it will be adequate to meet the obligations as

they mature is necessarily speculative. We shall assume, however, for the purpose of this case, that the fund will be at all times sufficient. Nevertheless, that assumption does not change the character of the obligations as a state debt, and a state debt payable by state taxation. It is still payable from state resources, and, in the last analysis, by taxation. By way of further illustration, we will consider the loan authorized by the act under consideration. The act authorizes the issuance of $60,000 four per cent, thirty-year bonds. The board of trustees has divided the principal into thirty parts, one bond maturing annually each successive year. The amount of interest which will accrue and must be paid during the thirty years, amounts to $37,200. This, with the principal, makes a total sum of $97,200, which, under the terms of the act, must be paid from the interest and income of the fund dedicated by the enabling act and the Constitution to the support of this institution. It must be apparent to every one that, if the sum of $97,200 of the funds which are available and provided for the support and maintenance of this school for the next thirty years is diverted, it will be neces sary, in order to maintain the school, that this amount shall be replaced, and, of course, this can be done only by general taxation. That no doubt may exist, let us further illustrate. Assume that the sum of $97,200, diverted and withheld, as it necessarily must be if this act is valid, is sufficient to maintain the school during the thirty-year period. Is it not apparent that when this sum is with-drawn from the support of the school it will be compelled to close its doors for want of funds to sustain it, or, if it does not, that the exact sum diverted, towit, $97,200, must be restored by general taxation for its support? Again, assume that the cost of mainte-nance will be double the amount of diversion; that is, $194,400. For this purpose the state has an existing income of $97,200, derived from the interest and income dedicated to the support and mainte-nance of the school. The remaining $97,200 must be raised by gen-eral taxation, and that is the extent of the taxpayer's burden. Now, divert the amount necessary to pay the interest and principal of these bonds, towit, $97,200, and what is the result? The taxpayers of the state, to meet the expense of maintaining the institution, are compelled to increase their burden to the exact amount diverted. A more forcible illustration of the true character and underlying fal-sity of this financial scheme will be afforded by a complete state-

ment of the bonds authorized to be issued by the legislature upon this plan up to date.

| Year Authorized | Name of Institution | Mature in | Interest— Per Cent | Amount |
|---|---|---|---|---|
| 1891 | Valley City Normal.................................... | 20 years | 6 | $  20,000 |
|  | Mayville Normal..................................... | 20 years | 6 | 20,000 |
| 1901 | State University ..................................... | 20 years | 4 | 50,000 |
|  | Agricultural College ................................ | 20 years | 5 | 50,000 |
|  | Reform School...................................... | 20 years | 6 | 20,000 |
| 1903 | Industrial School.................................... | 20 years | 4 | 40,000 |
|  | Normal School, Valley City........................... | 30 years | 4 | 60,000 |
|  | Normal School, Mayville............................. | 30 years | 4 | 60,000 |
|  | Blind Asylum ....................................... | 20 years | 6 | 20,000 |
|  | Reform School ...................................... | 20 years | 4 | 20,000 |
|  | Deaf and Dumb Asylum.............................. | 20 years | 4 | 66,000 |
|  | State University .................................... | 20 years | 4 | 150,000 |
|  | Agricultural College ................................ | 20 years | 4 | 135,000 |
|  | Academy of Science ................................. | 20 years | 4 | 30,000 |
|  | Total .............................. | .......... | .... | $ 741,000 |

The principal of these bonds, together with the interest contracted to be paid, will amount approximately to $1,300,000; all of which under the terms of the several acts authorizing them, must be paid from the interest and income fund of the several state institutions for whose benefit they are issued. We will assume that the interest and income fund will be sufficient to meet the obligations, and again it is proper to say that this may be a questionable assumption, when we consider that the aggregate interest and income fund of all the institutions above named, from statehood to July 1st of the present year, amounted to but $94,959.04. But we shall assume that these funds will be adequate to pay the indebtedness of $1,300,000 represented by these bonds. Does it not follow necessarily that, when you withdraw this sum from the support and maintenance fund of these state institutions, you must restore it? And this can be done only by taxation. It is not important how you name the purpose of the tax so exacted. It may be termed a tax to maintain the institution, or a tax to replace moneys diverted from the interest and income fund. In its effect upon the taxpayer it is a tax imposed to pay the principal and interest on money borrowed by the state—a state debt, and one contracted in plain violation of the constitutional debt limit. The only plan—and it is one which in no way argues for the validity of the act—upon which it can be said that the interest and income of these institutions will pay the obligations of these instruments without a resort to taxation involves the

closing the institutions after the loans are made until such time as the debt and interest have been discharged from the interest and income fund. So long as the institutions are maintained and supported by the state, and taxation is resorted to, every dollar of the interest and income fund which is diverted must be restored by taxation. It is not suggested that it is a part of the policy of this legislation to close the doors of these institutions. This particular scheme of finance, while indigenous in the state, is not without its parallels. The state of New York at an early date engaged largely in works of internal improvement. It built and owned the Erie canal, and in doing so incurred a large state indebtedness, with the result that the entire subject was placed under constitutional control in 1846. The net annual revenue from the canal amounted approximately to $800,000. The Constitution required that the net revenues should be applied as follows: First, a fixed sum to pay the interest and apply on the principal of what was known as the "canal debt"; second, another fixed sum to apply upon the state debt known as the "general fund debt"; third, a definite sum to the general revenue fund of the state. It was then provided that, after satisfying the above requirements, "the remainder of the revenues of the said canal shall in each fiscal year be applied in such manner as the legislature shall direct to the completion of the Erie canal enlargement and the Genesee valley and Black River canals until the said canals shall be completed." In order to hasten the completion of the canal, the legislature of 1851 passed an act authorizing the comptroller to issue canal revenue certificates to the amount of $9,000,000, payable out of the surplus revenue of the canals above the amounts required by the constitutional provisions above referred to, and required that said certificates "shall purport on their face to be issued by virtue of this act and without any other liability, obligation or pledge on the part of the state than such as is contained in this act." Elsewhere the act provided that "the state shall in no event be liable to make up any deficiency in the canal revenue or to redeem the certificates from any other source than the canal revenues, as directed by the act." The question as to whether this act was in violation of the provisions of the Constitution forbidding the creation of a state debt in excess of $1,000,000 was presented to the Supreme Court of New York in the case of *Rodman* v. *Munson*, 13 Barb. 63, and to the Court of Appeals in *Newell* v. *People*, 7 N. Y. 9. In both cases it was held, after careful consideration, and upon

cogent reasoning, that the act authorized the creation of a state
debt within the meaning of the Constitution, and this although
the act in terms attempted to exempt the state from liability for
any deficiency that might arise in the fund pledged for its payment.
In addition to other reasons, the act was held to violate the Consti-
tution in two respects: (1) It applied a part of the revenues to
the payment of interest, instead of to the completion work, and (2)
it authorized the contracting of a debt by the state in excess of the
state debt limit. Ruggles, C. J., in discussing the question whether
it created a state debt, used the following language, which meets
our full approval: "It makes no difference whether the debt is
contracted on the general credit of the state or on the credit of a fund
belonging to. the state. When the interest on a loan is raised by a
tax it comes from the pockets of the people individually, when it
is paid out of a fund belonging to the people, it is paid out of their
common purse. In respect to the profit and loss of the transaction,
the objection is as great to the one mode of borrowing as to the
other. The chief object of the restraint imposed by the twelfth sec-
tion of article 7 of the Constitution (the debt-limit section) upon
the contracting of public debt was to protect the people against the
exhausting burthen of paying interest." Johnson, J., in a con-
curring opinion, said: "If language has any meaning, the legal
effect of the act, if valid, is at least to devote so much of the sur-
plus revenues of the canals as shall actually be received after 1854
to the creation of a fund to pay the canal revenue certificates and
the interest thereon. If this can be done in regard to one source
of revenue, we see no reason why the same thing may not be done
in regard to every source of revenue of the state, including not only
all revenue which may arise from property, but also all which may
be realized by the exercise of the power of taxation. Such an an-
ticipation of revenue would no more create a debt than this bill
does. It may be objected that there is a distinction between a pledge
of the revenues of property owned by the state and of the revenues
to be derived from taxation; but the distinction does not affect the
question. Whatever consumes the revenues of the property of the
state tends to render a resort to taxation necessary just to the extent
to which the revenues from property have been consumed. It is,
therefore, a matter of entire indifference whether one or another
part of the resources of the state is drawn upon; for the substan-
tial effect upon the financial condition of the state is the same in

either case. If the constitutional provision against incurring debts permits such a scheme as this to be effectual, it is of small moment to inquire what it prohibits, for it provides no practical restraint whatever upon the power of the legislature. To attribute such an intention to the convention or to the people as to permit the one and prohibit the other is to attribute to them an entire incapacity to comprehend the subject on which they were acting, and the effect of their own language. * * * State obligations assume every form which can tempt the possessor of money to part with it to the government, and are varied from time to time as one or the other seems most likely to accomplish the purpose of putting out promises and getting money in return. In all these forms one common attribute is found, and one only, towit, that, in consideration of money advanced to the state, the state promises whatever it is that will be most likely to procure money to be advanced, it matters not what; and that which is thus promised is debt. It may relate only to the income of particular property, or it may embrace the whole resources of the state. The extent of the obligation does not affect or qualify its nature. So long as there is an obligation assumed by the state, it constitutes a debt; something due from the state." We also quote from the concurring opinion of Edmunds, J. Upon this point he said: "It is said that it is not a debt, but merely anticipating the resources of the state as derived from the canals. Now, it seems to me that all debt, whether by individuals or states, is merely an anticipation of resources. Then, again, it is said that it is no debt because only a portion of the resources of the state are devoted to the repayment. Does the fact that every householder has certain property that is not liable for the payment of his debts destroy, or even change, the character of the obligation that rests upon him to repay money that he has borrowed? These, and such like suggestions, which were made to us on the argument, have not had the effect to persuade me that borrowing money is not contracting a debt." The views of Brown, J., who wrote the opinion in *Rodman* v. *Munson, supra,* in which the same act was involved, are expressed in language equally clear: "I cannot do otherwise than regard it as a loan—a loan of money to be repaid at a future day; not from the taxable property of the people of the state, or from the resources and revenues of the state generally, but qualifiedly and specially from that portion of its resources known as the 'remainders of the canal revenues.' There cannot be a loan of

money without a lender and a borrower, and there cannot be a contract of lending without creating a debt and an obligation to repay in some form and to some extent. The time of payment may be postponed to a distant day. The contract may provide that payment may be made in property, in current coin, or in a depreciated currency. It may be payable, as in the case of the canal certificates, from the proceeds of the income of certain specific property, but it remains a debt notwithstanding. The particular form or medium of payment, or the specific source from whence the means of payment is to be derived, may lessen or circumscribe the obligation of the debtor, but it cannot efface the obligation, or transform it into something which is to be recognized by another name, until the source from whence it is to proceed has failed, and the means of its payment is extinguished."

The same principal was involved in *City of Joliet* v. *Alexander* (Ill.), 62 N. E. 861. The city of Joliet owned a system of water-works which netted an annual income of about $10,000. It desired to extend and improve the system. The city indebtedness was up to the constitutional debt limit, and the city council authorized the issuance of water fund certificates to the amount of $240,000, to be paid out of the waterworks fund, to which they were in terms limited; that is, it pledged the revenues of the plant, and mortgaged the plant itself to secure the loans evidenced by the certificates. It was held that the ordinance violated the constitutional debt-limit provision. It was said that, although no action could be maintained against the city, still, in common understanding, the certificates constituted a debt. "Where one party occupies the position of creditor and another of debtor, there is, in the common understanding, a debt. The state is not liable to be sued by its citizens upon any of its obligations, but no one would think of saying that the state is not indebted where it has issued bonds or certificates of indebtedness, and where there is a legal, moral, or equitable obligation to pay. * * * One who pawns or pledges his property, and who will lose the property if he does not pay, is indebted, although the creditor has nothing but the security of the property; and so, also, is a mortgagor who is liable to lose his property if he does not pay the money secured by the mortgage. No one would agree to the proposition that a city could obtain money by mortgaging the city hall, the buildings of the fire department, or other property of the city, without a promise to pay, but so as to enable

the creditor to take them in satisfaction of the loan, under a statute authorizing such action, and yet not create any indebtedness of the city. We see no difference between mortgaging the public buildings and property of the city and mortgaging its system of waterworks. * * * The ordinance proposes to take the income now derived from it, amounting to about $10,000 a year, and devote it to the payment of the certificates. This is existing property and income of the city,' derived annually from the present system of waterworks, independent of the extension, and in no manner resulting from or depending upon it. The city is to lose property in the form of established income for the purpose of paying the certificates. If the city, being indebted beyond the constitutional limit, can issue certificates payable out of that fund without creating a debt, it would be equally within its power to issue obligations by pledging the fund derived from dramshop licenses, or licenses from hackmen, peddlers, theatres, or amusements, or any other funds of the city. All of the revenues of the city, except such as would be derived from general taxation, might in that way be pledged or mortgaged for long years to come; and we apprehend that no one would be found to say that such a scheme would not be a mere evasion of the Constitution. * * * It does not make any difference that the certificates are payable out of the special fund, if the city is the owner of the fund. All of its obligations are payable out of some particular fund. The city council is required, in raising money by taxation, to make appropriations, specifying the objects and purposes for which they are made, and the amount appropriated for each object and purpose. The money and appropriation raised for one purpose cannot be applied to any other, and the accounts of each fund and appropriation, and the debits and credits, belonging thereto, must be kept in a separate account. The debts chargeable to a particular fund are payable only out of that fund, and it makes no difference what fund they are chargeable to or payable out of, if the fund is one which belongs to the city. * * * The principle involved in special assessments, under which the warrants issued by a city do not constitute indebtedness of a city, cannot be applied to this case. The city is in no way liable for their payment, and never owns the fund out of which they are paid. *Quill* v. *City of Indianapolis,* 124 Ind. 292, 23 N. E. 788, 7 L. R. A. 681. The improvement, when made, becomes the property of the city, but the cost and expense fall upon the property holder.

If more should be collected than will pay the warrants, it is rebated to the property owners. If the warrants are not paid, the remedy is confined to the property of individuals. A special assessment is a lien upon individual property, and not upon property of the city; but in this case the holders of certificates would have a right to take and appropriate a pre-existing income of the city for the payment of the certificates, and also to enforce payment by a sale of property of the city. The certificates would be in no sense chargeable upon the property of individuals, but solely upon the income and property of the city, including property already owned by the city." The case of *Mayor of Baltimore* v. *Gill,* 31 Md. 375, 390, is to the same effect, and we know of no cases in which the soundness of the reasoning of these cases has been questioned.

It was contended by counsel for the board "that the contemporaneous construction of all the departments of the state government settles the legality of the issue of these bonds and the investment of these funds in them." To this we cannot assent. The rule of construction which permits courts to resort to contemporaneous construction by nonjudicial officers has no application here. It is only when the language of the law or of the Constitution which is to be construed as ambiguous and doubtful that courts are authorized to resort to such extrinsic sources of interpretation. To follow the practical construction placed upon their authority by the legislature and by the officers charged with the duty of administering this trust would be to abolish the plain provisions of the Constitution without the formality of taking a popular vote. The true rule is stated in Cooley's Const. Lim. 83, as follows: "Contemporary construction * * * can never abrogate the text; it can never fritter away its obvious sense; it can never narrow down its true limitations; it can never enlarge its natural boundaries. * * * Acquiescence for no length of time can legalize a clear usurpation of power where the people have plainly expressed their will in the Constitution, and appointed tribunals to enforce it."

The question whether the interest and income dedicated by Congress "to be expended in the support of" this and the other educational institutions of the state can lawfully be used to erect buildings and make permanent improvements, or whether it can only be used for current expenses, was discussed at considerable length by counsel. On this point the Supreme Court of Washington, in reference to the interest and income fund belonging to the common

schools, in *Sheldon* v. *Purdy*, 49 Pac. 230, said: "This fund, under the Constitution, is devoted to the support of the public schools. That portion coming from the irreducible common school fund is devoted to the payment of current expenses. The building of new schoolhouses and the purchase of schoolhouse sites do not come within any authorized signification of 'current expenses.' Neither do they come within any well defined acceptation of 'support of the common schools.' Both the terms 'support' and 'current expenses,' when applied to the common schools of this state, mean continuing regular expenditures for the maintenance of the schools. Building a new schoolhouse and purchasing a site, while at times necessary and proper, are, as a rule, unusual and extraordinary expenditures." Whether this construction should govern in this state we shall not determine. This question is not involved in this case. The act under consideration does not appropriate the interest and income of the normal school to erect buildings. On the contrary, under the terms of this act, the state borrows money and erects the buildings from the borrowed funds, and the act appropriates the interest and income of the institution, not to erect the building, but to pay the debt which the state has contracted for the borrowed money. Under this act the state proposes to borrow $60,000, and invest it in buildings and equipments, and to meet the obligations of the loan it appropriates from the interest and income fund of this institution, dedicated to its support, the sum of $97,200, to pay the debt thereby contracted. It does not appropriate the funds, either to erect buildings or to pay current expenses, but to pay the principal and interest of a state debt. The people of this state, in their Constitution, in plain language limited the authority of the legislature to contract state debts to $200,000, and in language equally plain they restricted the board of university and school lands to four kinds of securities for investing the permanent educational funds. If, as is contended, securities of the kind designated by the Constitution cannot be had in sufficient amount to absorb the funds available for investment, the people alone can furnish the remedy by an amendment to the Constitution. Indeed, an amendment was proposed by the recent legislature, and referred to the next legislature, which, if approved by the people, will authorize the board of university and school lands to invest the moneys of the permanent school funds and other educational funds in bonds of counties, townships, and municipal bonds, in addition to these classes now

authorized. So, too, if the debt limit is in fact too low, the people alone can remove the limitation. The legislature cannot repeal it, or amend it, or nullify it by evasion. The question of the state debt limit was the subject of extended consideration by the members of the constitutional convention. Some favored placing no restriction upon legislative power; others favored a limitation as low as $50,000. As a result of compromise, the amount to which the legislature might contract was limited to $200,000, and for the further protection of the credit of the state it was required that the act authorizing the creation of the debt should make provision for payment of the principal and interest by an irrepealable tax levy; and, further, that "no bond or evidence of indebtedness by the state shall be valid" unless the same shall have indorsed thereon a certificate showing that it is within the debt limit. The fixing of the state debt limit was and is a matter for the people to determine for themselves as a matter of state policy. They saw fit to fix it at $200,000, and until it is altered by them it must be respected by the legislature. The three states admitted into the Union with this state under the same enabling act fixed their debt limits as follows: Montana and South Dakota at $100,000, Washington $400,000. California, Nebraska, and Wisconsin each have a debt limit of $100,000, Minnesota $250,000, and Michigan $50,000. By a comparison of population and resources, it can hardly be said that the framers of our Constitution were ungenerous in the limit placed upon legislative power.

It is patent that the board of university and school lands, in purchasing these bonds, merely followed the financial policy of the legislature. The act under consideration, while it does not command the board to purchase the bonds, for the legislature has no such power under the Constitution, commands that they "shall first be offered for sale to the board." Indeed, it is not too much to say that it was the legislative purpose, in authorizing the issuance of this class of bonds, to have the permanent educational funds invested in them. In yielding to this legislative policy, the board was clearly in error, and in doing so violated the plain provisions of the Constitution, which mark the limit of their authority and prescribe their duty. When the Constitution speaks, its voice is supreme, and its mandates are to be obeyed by all departments and all officers of the state government.

The members of this court are not unmindful of the embarrass-
ment to this and other state institutions which are looking to
moneys derived from these proposed loans for buildings and im-
provements which will follow our decision. This will be temporary,
however, and is of small consequence compared with the permanent
injury which would be done to the people of the state if the courts,
to which they have committed the preservation of their constitu-
tional rights and the integrity of the Constitution itself, should fail
in the performance of their duty. It follows from what we have
said that the state treasurer, as the custodian of the permanent
school fund, acted in accord with his legal duty in refusing to pay
the warrant drawn for the proposed illegal investment.

The writ prayed for will be denied. All concur.