**BAKER v. CARTER, State Auditor, et al.**

No. 24397.  Sept. 26, 1933.

Wilcox & Swank, for plaintiff in error.

J. Berry King, Atty. Gen., and Randell S. Cobb, Asst. Atty. Gen., for defendants in error.

McNEILL, J. Plaintiff, a taxpayer and resident of Payne county, instituted an action in the district court of Oklahoma county to enjoin the State Auditor and the members of the State Board of Agriculture from issuing and selling bonds for the purpose of erecting dormitories on the campus of the Oklahoma Agricultural and Mechanical College at Stillwater.

The defendants were proceeding in this matter pursuant to the authority granted to them by House Bill 432, chapter 34,

art. 6, Session Laws of 1931 [O. S. 1931, secs. 7141-7148].

In order that we may determine the soundness of the contentions urged by plaintiff and defendants, it is necessary to examine said legislative enactment.

The title to said chapter 34, art. 6, is as follows:

"An act authorizing the construction and equipment of a dormitory or dormitories on the campus of the Agriculture and Mechanical College of the State of Oklahoma; providing for the issuance and payment of Oklahoma Agricultural and Mechanical College dormitory bonds; providing the manner of expending the proceeds of the bonds; providing for the management of the dormitory; authorizing the investment of municipal, sinking funds and the capital and surplus of banks, trust and insurance companies in said bonds; making same approved security for the deposit of public or trust funds; making the bonds nontaxable for any purpose, and declaring an emergency."

Section 1 of of the act provides:

"The State Board of Agriculture, acting for and in behalf of the Agricultural and Mechanical College of the State of Oklahoma, is hereby authorized and empowered to set aside such portions of the campus of said Agricultural and Mechanical College, as may be necessary and suitable for the construction of a dormitory or dormitories thereon, and Oklahoma Agricultural and Mechanical College dormitory bonds are hereby authorized to be issued for the purpose of constructing and equipping suitable dormitories for the use of students attending said institution."

Section 2 provides for the issuance of bonds in an aggregate amount not to exceed $450,000 by the State Auditor upon the application of the State Board of Agriculture with the approval of the Governor endorsed thereon, in denominations of $100 to $1,000, due and payable within 25 years from their date at a designated place, with interest at a rate not to exceed five per cent. per annum, payable semi-annually.

Section 3 provides that the bonds shall be signed by the State Auditor to be registered with the State Treasurer, and that it shall be the duty of the Attorney General to prepare the form of said bonds, prescribe the method of procedure as to their issuance, and to examine into and pass upon any bond issue under the prescribed procedure.

Section 4 provides for the sale of the bonds by the State Board of Agriculture at not less than par and accrued interest.

Section 5 is as follows:

"The proceeds derived from the delivery of the said bonds shall be placed in the state treasury to the credit of the Agricultural and Mechanical College of the State of Oklahoma and kept in a separate fund to be known as the 'Agricultural and Mechanical College Dormitory Fund'. No contract shall be entered into and no obligation incurred in excess of the amount of said bonds theretofore sold. The State Auditor is hereby directed and authorized to issue warrants upon the state treasury against such funds for such amounts as he may from time to time find to be due upon audited itemized estimates and claims which bear the approval of the President of the Agricultural and Mechanical College of the State of Oklahoma and of the State Board of Agriculture."

Section 6 provides for the plans and specifications for the construction of the dormitory.

Section 7 provides for the sinking fund for the payment of the interest and principal of the bonds. It is as follows:

"The State Board of Agriculture is empowered and authorized to prescribe such rules and regulations for the conduct, management and care of the dormitories, constructed and equipped as provided herein, and shall provide for necessary rentals. charges and fees to be paid by the students attending the Agricultural and Mechanical College, who avail themselves of the use of said dormitory or dormitories, as will be necessary to provide a sufficient sinking fund for the payment of the interest and principal of the bonds authorized herein, in addition to the amount necessary for the upkeep and maintenance of said dormitories, and such sums so collected shall be deposited in the state treasury, to the credit of a fund to be maintained and designated in the treasury as the 'Agricultural and Mechanical College Dormitory Sinking Fund' as herein provided and said sinking fund is hereby irrevocably pledged to the payment of the interest and principal of said bonds."

Section 8 provides that the bonds are nontaxable, and that any bank, trust or insurance company may invest its capital and surplus in said bonds. It also provides that any sinking fund of the state or of any municipality may be invested in said bonds by the officers having charge of such sinking fund. This section is as follows:

"Any bank, trust, or insurance company, organized under the laws of this state, may invest its capital and surplus in bonds issued under the provisions of this act. The officers having charge of any sinking fund of the state, or of any county, city. town, township, or school district thereof, may

invest the sinking fund of the state, of such county, town, township, or school district in bonds issued under the provisions of this act. Said bonds shall also be approved as collateral security for the deposit of any public funds and for the investment of trust funds. Said bonds shall be nontaxable for any purpose. The Board of Agriculture of the State of Oklahoma is required and directed to carry fire and tornado insurance on the said dormitories erected under the provisions of this act, and in case of damage to said building or loss thereof, the said insurance money is to be used by said Board of Agriculture to repair said buildings so damaged, or to rebuild same in case of total loss of any or all of them."

The defendants filed a general demurrer to the petition of plaintiff. This demurrer was heard by the Honorable Sam Hooker and Honorable Lucius Babcock, district judges of Oklahoma county, sitting en banc. The demurrer was sustained. Plaintiff elected to stand upon his petition and refused to plead further. The court thereupon ordered said cause dismissed. Plaintiff has appealed.

The question involved is the constitutionality of said chapter 34, art. 6.

The plaintiff contends:

(1) That these bonds, aggregating $450,-000, are general obligations of the state of Oklahoma, creating an indebtedness in excess of the state constitutional limitations provided for in section 23, art. 10.

(2) That said act does not conform to the requirements of section 25, art. 10, of the Constitution of the state of Oklahoma, in that it does not impose or provide for the collection of a direct annual tax levied against all of the taxable property in the state for the purpose of paying the principal and interest of the bonds as they fall due; and that it does not provide that the matters be submitted to the people at a general election for approval by a majority of all votes cast for and against the same.

(3) That, although the act provided that said bonds should be paid out of a special fund, yet such payment is not limited solely to the special fund therein provided for. For that reason, said bonds are not limited as special obligations of the state of Oklahoma, but are general obligations of said state incurred in violation of section 25, art. 10, supra.

The defendants contend:

(1) That these bonds do not constitute a general obligation or debt of the state of Oklahoma, and that the Legislature did not intend said bonds to be the bonds or debts of the state of Oklahoma.

(2) The Legislature intended the bonds to be, and the bonds are, the obligations of the Oklahoma Agricultural and Mechanical College, a separate corporate entity.

(3) The bonds are not debts of the state because they are payable only from revenue to be realized from the operation of the dormitories, and are therefore not debts within the meaning of the constitutional limitation on indebtedness.

(4) The bonds are not debts of the state because the Legislature did not obligate the state to levy direct taxes each year to pay the principal and interest of the bonds.

(5) That the "Oklahoma Agricultural and Mechanical College Dormitory Bonds," authorized by chapter 34, of art. 6, Oklahoma Session Laws 1931, do not constitute a debt of the state within the meaning of section 25, art. 10, supra, because a "state debt," under the Oklahoma Constitution, has a fixed meaning; that is, it is such an obligation as the Legislature is required to provide for by levying a tax to pay the annual interest and sinking fund to liquidate the principal at maturity. The Legislature in passing chapter 34, art. 6, Oklahoma Session Laws 1931, did not obligate the state so as to require it, the Legislature, to levy direct annual taxes to pay the bonds.

(6) The validity of the bonds is sustained by the weight of authority from other jurisdictions, the decisions of this court, and the legislative practice and custom in this state for a long period of time.

In construing the constitutionality of this legislative enactment, we are not concerned with its propriety, desirability, wisdom, or its practicability as a working proposition. Those questions are clearly and definitely established by our fundamental law to a certainty as functions of the legislative department of government. The function of the court is clearly limited to the determination of the validity or invalidity of the act. There is a presumption that the act is constitutional.

In 1 Cooley's Constitutional Limitations (8th Ed.) p. 371, it is said:

"When courts are called upon to pronounce the invalidity of an act of legislation, passed with all the forms and ceremonies requisite to give it the force of law, they will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation

and patient attention can throw any new light upon the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt."

The case of Newell v. People ex rel. Phelps, appealed to the Court of Appeals of the State of New York, 7 N. Y. 9, and the case of Rodman v. Munson, 13 Barb. (N. Y.) 63, are cited in support of the contention of plaintiff. The issuable question as gleamed from the opinions in those cases was the outgrowth of divergent and debatable contentions of many years in the state of New York. These views were presented to the framers of the new Constitution of New York when they assembled in 1846. For nearly a quarter of a century or more prior to the framing of this Constitution, the state of New York was concerned with its internal improvements in the way of the construction of a system of canals. The Erie and Champlain canals, which extended for a distance of approximately 427 miles, were completed by the state in October, 1823, at a cost of about $10,000,000, for which the state at the time of their completion owed for their construction approximately $7,000,000. It seemed apparent at that time that the revenue from these canals would be sufficient to early discharge the indebtedness incurred by the state against them.

During this period of their construction, and prior thereto, arduous and conflicting theories were presented as to the policy the state should pursue toward this internal development by a system of canals. It appears to have been the theory of one side that an extensive scheme of internal improvements, involving the construction of many other canals and the expenditure of many millions, should be obtained in the first instance by loans, and then be repaid out of the canal revenues. The other side strenuously denounced the creation of a state debt, and urged that the construction of other canals should be paid only out of the revenues as they should accrue. The framers of the Constitution, cognizant of these views, placed the entire subject of the canal system under constitutional control in 1846.

The syllabus of the case of Newell v. People ex rel. Phelps, supra, is as follows:

"The act of 10th July, 1851, for the completion of the Erie Canal enlargement, was unconstitutional, and contracts made in pursuance of it were void. It violates the constitutional provision that the surplus of the canal revenues shall be applied, in each fiscal year, to the completion of the canals; it applies part of such revenues to the payment of interest; it authorizes the contracting of a debt by the state; and it withdraws the residue of the canal revenues, after the completion thereof, from the general expenses of the government."

An examination of that case shows that the sole question considered was as to the constitutionality of the Act of 1851. Mr. Chief Justice Ruggles analyzes the provisions. A summary follows: Under article 7, sec. 1, the Constitution specifically appropriated and set part "in each fiscal year out of the net revenues of the state canals commencing about the 1st day of June, 1846, a certain sum as a sinking fund, to pay the interest and redeem the principal of that part of the state debt called the canal debt." The sum thus appropriated and set apart was $1,300,000, in each fiscal year from the 1st of June, 1846, "until the 1st of June, 1855, and afterwards $1,700,000 until the canal debt should be fully paid." It also specifically provided that the principal and interest of the sinking fund was to be sacredly applied to that purpose. Under section 2 of said article 7, the Constitution provided that after these provisions were complied with, there should be "appropriated and set apart out of the surplus revenues of the state canals, in each fiscal year, commencing on the 1st of June, 1846, a further sum, as another sinking fund, to pay the interest and redeem the principal of that part of the state debt called the general fund debt." The sum appropriated and set apart was $350,000 for each fiscal year, until a sufficient sum had been raised "to pay the interest and extinguish the entire principal of the canal debt; and after that period, then the sum of $1,500,000, in each fiscal year, until the general debt should be wholly paid."

Section 3 of said article required that after satisfying the aforesaid provisions, there should be paid out of "the surplus revenues of the canals, to the treasury of the state * * * in each year for the use and benefit of the general fund, such sum not exceeding $200,000 * * * to defray the necessary expenses of the state; and the remainder of the revenues of said canals shall, in each fiscal year, be applied in such manner as the Legislature shall direct to the completion of the Erie Canal enlargement, and the Genesee Valley and Black River Canals, until the said canals shall be completed."

The legislative enactment of 1851, with the ostensible design to hasten the completion of the enlarged system of canals, directed

the borrowing of $9,000,000 upon canal revenue certificates payable out of the future surplus revenues after the completion of the canals, and further provided for the application of the whole sum to the completion of the canals within three years. It is plainly apparent that such provisions were violative of the constitutional provision, and the court so held. The Constitution specifically provided that the remainder of the revenue of the canals shall in each fiscal year be applied to the completion of the canals until they shall be completed. The legislative enactment totally disregarded these constitutional provisions which had been so strenuously debated prior to their enactment. The Chief Justice, in his opinion in that case, said:

"The direction is not that the remainder shall be applied in some or any fiscal year, but in each fiscal year. * * * The language of the Constitution, by thus fixing the time when each remainder is to be applied, precludes both anticipation and delay. The application cannot be intentionally accelerated or retarded, without disobeying the command."

The legislative enactment provided for the finishing of the whole project within three years. This was repugnant to the constitutional provision which authorized the future remainders to be applied to defray the general expense of government. These revenues were revenues of the state, and the Legislature attempted to divert permanently their purpose contrary to the provisions of the Constitution.

The New York case is easily distinguishable from the instant case. It was plainly repugnant to the mandate of the Constitution which could not be thwarted by eager legislative intendment to devise another means of accomplishing what in its judgment seemed a more satisfactory plan than that which was set forth in plain, positive, direct, and unobscure provisions in a Constitution adopted by the people.

The canal system which had been completed prior to the legislative enactment belonged to the state. The revenues coming therefrom were the property of the state. Any enlargement, pledging the revenues, and the revenues arising from the enlargement, would continue to be the property of the state. The state's credit was pledged. A definite obligation of the state was created. The authority to create an indebtedness by the state implies an obligation for its payment by the levy and collection of taxes. United States v. New Orleans, 98 U. S. 381.

The state was bound. The additional indebtedness authorized by the issuance of the $9,000,000 exceeded the state constitutional debt limitation.

The state had a canal debt at the time the new Constitution was formed. By the authorized issuance of $9,000,000 in bonds for enlargement of the canal system, contrary to the provisions of the state Constitution, a further indebtedness of the state was incurred and placed a burden upon the taxpayer in excess of the state constitutional limitation, in the event of loss or failure of revenues sufficient to discharge the increased indebtedness.

The law applicable to the state of facts in the New York cases is not controlling of the facts in the instant case. We have no direct obligation on behalf of the state. No fixed liability is involved, and no strong reason is presented for believing that any contingency, immediate or remote, will ever arise whereby any debt or obligation will be incurred on behalf of the state, or any political subdivision thereof, by reason of a permissive or authorized investment of any sinking fund, of the state or of any county, town, township or school district in bonds authorized under the provisions of this act.

Counsel for plaintiff also cite the case of State v. McMillan (N. D.) 96 N. W. 310. In that case the legislative enactment of 1903 was considered. Under the provisions of that act, the board of trustees of the Normal School of Valley City was authorized to issue bonds in the amount of $60,000 to provide a fund for the erection and equipment of necessary additional buildings of said school. That case presented the single question of whether the Board of University and School Lands, composed of the Superintendent of Public Instruction, Governor, Attorney General, Secretary of State, and State Auditor, denominated the Board of University and School Lands, could lawfully, under the Enabling Act and under the state Constitution, purchase these bonds as an investment for the permanent school fund. Moneys which were sought to be invested in the bonds constituted a part of the permanent fund derived from the sale of land granted by Congress to the state upon its admission into the Union, for the support of common schools within said state. Section 11 of the Enabling Act provided that all lands granted for educational purposes should be disposed of only at a public sale and at a price at not less than $10 per acre, the proceeds of which were to constitute a permanent

school fund. The Constitution of the state accepted the grant and pledged the honor of the state to the observance of the obligation of trust, to wit, to maintain the permanency of the trust fund and to use the interest therefrom only for the support of the schools to which it was dedicated. The Constitution also provided that the Board of University and School Lands should have the control of the appraisal, sale, rental, and disposal of school and university lands, and should direct the investment of funds arising therefrom in the hands of the State Treasurer, as follows:

"The moneys of the permanent school fund, and other educational funds shall be invested only in bonds of school corporations within the state, bonds of the United States, bonds of the state of North Dakota, or in first mortgages on farm lands in the state not exceeding in amount one-third of the actual value of any subdivision on which the same may be loaned, such value to be determined by the board of appraisers of school lands." Const. N. D. sec. 162.

It also appears that the Constitution removed the control of the trust fund from legislative control and placed it with aforesaid elective officers, and deprived the Legislature and said board of the authority to determine the kind of security and trust fund to be invested, and for dereliction of duty regarding the safekeeping of the fund in any particular, punishment by felony was provided. These bonds were to be issued under the seal of the board of trustees of said normal school and not under the seal of the state of North Dakota. They were first to be offered for sale to the Board of University and School Lands. The court held that they were not bonds of the school corporation or bonds of the state of North Dakota, and did not fall within the classification of securities provided by the Constitution for investment of the permanent fund. The State Normal School at Valley City was not a school corporation or legal entity and could not levy or collect taxes; it owned no property; its trustees could not contract debts except within the limitations of appropriations made by the Legislature for its support. The state was charged with the support and maintenance of the institutions.

The court in analyzing the question of whose obligation was evidenced by the bonds held that the bonds were given for money borrowed by the state; that the state promised to repay the loan, both principal and interest; that it appropriated for the payment of principal and interest the interest and income of the permanent fund of the normal school, which was dedicated to the support of state schools by Congress and by the state Constitution, and in so doing the Legislature enacted and authorized the diverting of such interest and income from the purpose for which it was dedicated. In other words, the state was pledged to maintain this permanent fund inviolate and unfailing. The principal might be increased, but never diminished. It was to make good all losses in this permanent fund. This was an obligation of the state to which it had pledged its honor to maintain, and in case of loss the taxpayers of the state would be called upon to replace this deficit, which was contrary to the spirit of the Enabling Act and the Constitution of the state. It is apparent that the act of 1903, construed by the Supreme Court of North Dakota, has no application to the instant act under consideration.

The state of North Dakota subsequently considered the case of Wilder v. Murphy, 63 N. D. 436, 218 N. W. 156, which arose out of a legislative enactment in 1927, providing for the erection of dormitories on the campus of the State University. The court held the act unconstitutional. It appears that the act provided that the net income from the dormitories, which included three dormitories which had previously been erected by the state upon the campus of the State University, should be used to pay the principal and interest upon any bonds issued to provide the moneys with which the buildings were to be built. It is to be observed that the board pledged the income from these dormitories, three of which had been completed at the expense of the state. The property of the state was mortgaged and pledged to that extent to pay for these bonds and interest. This was a plain disability against constitutional debt limitations.

Counsel for plaintiff also cite the case of State of Utah ex rel. University of Utah v. Candland et al., Members of the State Board of Land Commissioners, 104 P. 285. In that case an application was made for a writ of mandamus to compel the State Land Commissioners to comply with the provisions of a statute providing for the erection of a building by the University of Utah. The statute, being chapter 124 of the Laws of Utah, 1909, authorized and directed the Regents of the University of Utah to expend $250,000 to erect a central building on the University campus. The act also authorized and directed the said Board of Land Commissioners to convert sufficient investment of the University of Utah permanent land

fund into cash to pay the same as well as all cash on hand belonging to such fund as a loan until such payment should equal $250,000. The act also provided that such loan should be the debt of the University of Utah and not of the state of Utah.

Section 8 of the Enabling Act, after granting certain lands to the state of Utah for the establishment of the University of Utah, containing the following language:

"That the proceeds of the sale of said lands, or any portion thereof, shall constitute permanent funds to be safely invested and held by said state, and the income thereof to be used exclusively for the purposes of such university."

Section 10 of the same act also provided:

"That the proceeds of lands herein granted for educational purposes, except as hereinafter otherwise provided, shall constitute a permanent school fund, the interest of which only shall be expended for the support of said schools."

The court held that the loan provided was an obligation of the state of Utah; that it violated sections 1 and 2 of article 14 of the Constitution of Utah, relative to the exceeding of the state debt limitation, and diverting of the trust fund of the state from the purposes created by the Enabling Act; that if the funds from the permanent trust funds were destroyed, the state would be called upon to restore the same. The case has no application to the facts in the instant case. There is no permanent trust fund of the state herein involved.

The case of Zackary v. City of Wagoner, 146 Okla. 268, 292 P. 345, is cited by the plaintiff as authority for his contention that in this case a debt is created in violation of the said constitutional provisions. In that case the city of Wagoner purchased Diesel engines, and provided for the payment of the purchase price thereof over a period of years from the savings accruing to the city each month from the operation of the said plant during said period of time when operated with the Diesel engines over the income derived from the plant accruing during a like period of the fiscal year of 1926-1927 before it was equipped with the Diesel engines, and this court held that an indebtedness was created thereby in violation of the constitutional provisions. In that case a portion of the corpus of the lighting system of the city created by an ad valorem tax was utilized to feed the special fund provided for the payment of the Diesel engines. In that case there was a direct creation of an indebtedness. In the instant case there is no such relationship on behalf of the state or any political subdivision.

The Oklahoma Agricultural and Mechanical College is a public corporation, a separate legal entity, whose government and management is vested in a board of regents, the State Board of Agriculture. Section 7244, O. S. 1931; Trapp, State Auditor, v. Cook Construction Co., 24 Okla. 850, 105 P. 667. It has the power and authority to do everything necessary and convenient, where it is not prohibited, either expressly or impliedly by law, to accomplish the objects for which the institution was founded (Connell v. Gray, 33 Okla. 591, 127 P. 417; Rheam v. Board of Regents, University of Oklahoma, 161 Okla. 268, 18 P. [2d] 535); and to do all things necessary to make the college effective as an educational institution. Section 7246, O. S. 1931.

There is no constitutional or statutory inhibition against the power or authority of the board of regents in issuing the bonds in question for the construction and equipment of the dormitory payable out of a special fund provided, to wit, rents and fees to be received from the students using the dormitory while in attendance at the college.

The Supreme Court of Minnesota, in a recent case, Fanning v. University of Minn., 236 N. W. 217, considered a legislative enactment providing for the erecting of a dormitory on the campus of the University of Minnesota. The dormitory was to be paid out of the earnings of the dormitory, campus rentals, and certain outside and incidental earnings of the press belonging to the university. The act provided that the bonds which were to be issued should be the obligations of the regents of the university as a corporation, secured by and payable out of only the aforesaid earnings and rentals, and also provided that no personal liability should attach to or be incurred by the state of Minnesota, the regents of the university, or any member or official of its board of regents. The court in that case said:

"The Constitution vests the government of the University of Minnesota in the Board of Regents, following State v. Chase, 175 Minn. 259, 220 N. W. 951; and in the exercise of its granted power of government, so long as it keeps within the limits of its grant, it is not subject to legislative or executive interference or judicial control at the suit of a taxpayer.

"In the exercise of its power of government, the board may construct a dormitory upon the university campus without legislative authority.

"The proceeds of rentals from buildings on the campus, not used for university purposes, assigned in a proviso of an appropriation bill to the maintenance and improvement of the campus, may be used in the construction of a dormitory.

"Such rentals belong to the university without an appropriation by the Legislature and are subject to use in the construction of a dormitory or may be used for other purposes as determined by the board.

"In the construction of a dormitory, the board may use earnings from its university press for work done outside of that done for the university, the earnings being incidental to its use for university purposes.

"The board may appropriate the net earnings of the dormitory and pledge rentals and earnings of the character noted to the payment of money advanced for dormitory construction and undertake that they shall be so applied. It may evidence its pledge and undertaking by writings called bonds, which exempt the state and the university and the regents and officers from personal liability, as well as all the property of the state, the university, and the board, including the dormitory itself, from any charge. Thereby a debt of the state or a pledge of its credit is not contracted within article 9, secs. 5-9, of the Constitution."

In the Minnesota case, the body corporate was the board of regents instead of the university. In the instant case, the body corporate is the Agricultural and Mechanical College. In the instant case no portion of the campus upon which the dormitory will be constructed or any other property of the Oklahoma Agricultural and Mechanical College of the state is pledged as security for the payment of the bonds. It is specifically set forth in section 7 of the act, chapter 34, art. 6, supra, that the bonds shall be paid by rentals, charges, and fees to be paid by the students attending the college, and that these rentals and charges and fees are to be fixed by the state board of the college in such amount as may be necessary to provide a sinking fund to pay the interest and principal on said bonds. This sinking fund is pledged to the interest and principal on the bonds. No other method of payment has been provided. The payment of the bonds is limited solely to this special fund.

The Supreme Court of North Dakota also considered the case of State v. Davis, 229 N. W. 105. This case involved the establishment of a dormitory on the Agricultural College at Fargo, N. D. The action was instituted to enjoin the members of the Board of Administration of the state of North Dakota from granting a permit to enter into any arrangements with the Agricultural Dormitory Association of Fargo, N. D., for the erection of a dormitory on the campus of the Agricultural College of that state. It was contended that the legislative enactment of 1929 was unconstitutional and void, in that the act authorized the Board of Administration to create an obligation of the state in excess of the debt limit of the state as prescribed in section 182 of the Constitution of said state. The court in the body of the opinion said:

"It is true the statute permits a portion of the campus to be occupied by a dormitory erected by the institutional holding association; but the dormitory may be operated only for the benefit and use of the educational institution. In short, it may be used only to facilitate the work of that institution. The Legislature has determined that there is such an existent need for a dormitory as to justify the construction thereof upon the terms and conditions prescribed in the act. The Legislature must also have determined that it would be for the benefit of the Agricultural College (and the other educational institutions specified in the act) to have dormitories constructed upon the terms and conditions prescribed, and that consequently it is to the advantage of the state and the various educational institutions named in the act that this be done. If there is a necessity for the construction of such buildings to facilitate the work of the particular educational institutions at which they are authorized to be constructed, then there is obviously ample consideration for the use of the sites on which dormitories may be constructed. This being so, there is, of course, no donation. * * *

"It is next contended that the act authorizes the board of administration to create an obligation on the part of the state in excess of the debt limit prescribed by section 182 of the Constitution. This contention cannot be sustained. Under the terms of the act there is no possible way in which any obligation can be incurred on the part of the state. All debts incident to the construction and equipment of a dormitory will be the debts of the institutional holding association. And the act specifically provides that, in case the board of administration leases and agrees to purchase the dormitory and equipment from the institutional holding association, the rental and purchase price shall be payable and paid solely and exclusively out of the income derived from the operation of such dormitory * * * and * * * that the state shall incur no liability whatever by reason of the exer-

cise of the authority' granted to the board of administration.

"Here again the statute in this case is strikingly different from that involved in Wilder v. Murphy (56 N. D. 436, 218 N. W. 156) supra. Under the statute involved in that case property of the state was to be pledged and rendered subject to mortgage given by the institutional holding association. That is not the situation under the statute in question here. Here no property of the state is pledged, and no obligation can be incurred on the part of the state, either directly or indirectly, on account of any dormitory that may be constructed, equipped or maintained under the provisions of the act."

The Supreme Court of Oregon also considered a similar question in the case of McLain v. Regents of University of Oregon, 265 P. 412. This was a suit to enjoin the issuance and sale of bonds in the amount of $400,000, the proceeds of which were to be used in the construction of a dormitory on the campus of the University of Oregon. In that case the court held:

"University of Oregon is not an independent legal entity, but is an administrative agency vested by Legislature with certain corporate powers, and any indebtedness authorized by statute is an 'indebtedness of the state' within meaning of Const. art. 11, sec. 7.

"Action of board of regents of State University pursuant to Laws 1927, p. 364, secs. 1, 2, authorizing sale of bonds for construction of dormitory with the only liability against a special fund to be made up exclusively of net rentals received therefrom, held not in violation of Const. art. 11, sec. 7, limiting state indebtedness.

"Board of regents of State University had power, under Laws 1927, p. 364, secs. 1, 2, to issue bonds for construction of dormitory, only liability created being against a special fund to be made up exclusively of net rentals."

In the body of the opinion, the court said:

"Having held that the 'regents of the university,' although a public corporation, is nevertheless an agency of the state and not an independent legal entity, we next inquire, Does the legislative act authorizing the construction of a dormitory from net rentals contravene the constitutional provision relative to limitation of indebtedness? We think the act is reasonably susceptible of the construction which the regents have given it as disclosed by their resolution. It does not purport to authorize the board of regents to contract any indebtedness other than to pledge, on behalf of the university, the net income from the rentals of the building. The regents are not taking from

any existing fund the revenue of the university, but propose that the dormitory to be erected will earn enough to pay the principal and interest of the bonds. Indeed, the building is the exclusive source from which the payment of the bonds can be made. The resolution recites, and it should be so stipulated in the bonds, that 'said bonds be limited in payment to the special fund to be derived from said building, and from that fund only.' In the event the net income from rentals is not sufficient to pay principal and interest on the bonds, there is no resulting liability against the university or the state. The act does not contemplate nor provide for the levy of any additional tax. However, the board of regents, as expressed in its resolution, must 'use its best efforts to the end that said fund will be sufficient to pay said bonds and the interest thereon when due.'

"The only liability is against a special fund which is to be made up exclusively of net rentals. No violation of the constitutional provision against indebtedness is involved. * * *

"We conclude that neither the funds of the state nor the university fund, nor any other funds now controlled by or belonging to either the state or the university will, in any way, be impaired or drawn upon in the event that this dormitory is constructed under the proposed plan. Plainly no debt is created within the meaning of the Constitution.

"We see no merit in the contention that the board of regents have no power under the act to issue bonds. Hall v. Hood River Irrigation District, 57 Ore. 69, 110 P. 405."

The Supreme Court of New Mexico, in the case of State v. Regents of University of New Mexico, 258 P. 571, also considered a suit for an injunction on behalf of the state by the Attorney General seeking to enjoin the regents of the University of New Mexico from putting out a bond issue of $90,000 of building and improvement bonds. In that case the court held that the bonds issued by the University of New Mexico were not obligations of the state and that no provision for taxation to provide the interest and sinking fund need be made and the approval by the voters need not be had. The court also held that such bonds were a valid obligation of the university. In the body of the opinion, the court said:

"The Attorney General argues that the proposed bonds are in effect the obligation of the state, and as such may be issued only in compliance with the provisions of section 8 of article 9 of the Constitution, which requires that any law authorizing any such debt shall provide for an annual tax levy sufficient to pay interest and provide a sink-

ing fund, and each law shall be submitted to a vote of the people for approval, neither of which requirements have been complied with. The argument is unsound and based upon a false premise. It is true that the state holds the legal title to the lands granted by Congress, but there is nothing in the enabling act or the state Constitution preventing the state from making the state university and other state institutions the beneficiary of these grants, and empowering them to make such use of the proceeds or income therefrom as it may be deemed proper, within the limits prescribed by the congressional legislation. In the case of the university, by section 11 of article 12 of the Constitution, it was made owner of the state educational institutions, and by section 12 of the same article the lands granted or confirmed by the enabling act for university purposes were accepted and confirmed to it for such purposes. We have then a case where a grant of lands has been made to the state as trustee, for the use and benefit of the university as beneficiary, the income whereof may be used by the university in such manner as the state may by law provide, subject always to the restrictions of the congressional legislation, if any there are. In this case, however, there are no restrictions imposed. The Legislature therefore had power to authorize the university to make such use of its income as was deemed best. This is all that is contemplated by chapter 47, Laws 1927, and all that is proposed by the university. It proposes to contract with its bondholders that it will appropriate out of its income sufficient sums of money to pay interest and provide a sinking fund for the retirement of the bonds. It does not propose to mortgage its property in specie. It simply agrees to pay out of its income. How it can be said that this will be an obligation of the state, we cannot understand. This is simply a contract of the university to pay out of a designated fund when received. It is no more an obligation of the state than would be the obligation to pay the salaries of the university faculty. The mere fact that the university is the creature of the state and one of its instrumentalities to carry out its governmental functions is not controlling. The state has given the university certain property rights and has authorized it to make use of the same in a certain manner. This the university is proposing to do, and we can see no objection to the same."

In the instant case the legislative intendment, as disclosed by the act, is that the dormitory or dormitories proposed to be erected will earn an income sufficient to pay the principal and interest on the bonds sought to be issued. It is specifically provided that these are "Oklahoma Agricultural and Mechanical College dormitory bonds." Does the act contravene sections 23 to 25, inclusive, of art. 10 of the state Constitution? We hold that it does not.

59 C. J. page 225, sec. 370, announced this general rule:

"Obligations, issued by a state, if payable only from the revenue to be realized from a particular utility or property, acquired with the proceeds of the obligations, if payable only from the revenue to be realized from special taxes for a particular utility or property, acquired by the obligations or proceeds, or if payable only from a special fund to be raised from the sale or lease of lands previously set apart for the purpose of the obligations, do not generally constitute debts of the state within the meaning of constitutional limitations on indebtedness. * * *"

Our court has considered what constitutes a state debt, as the term is used by section 4, art. 15, of the Constitution, in the case of Graham v. Childers, 114 Okla. 38, 241 P. 178. This case involved a supplemental appropriation of $650,000 made by the Legislature, approved April 19, 1925, to provide for free text-books for the fiscal year ending June 30, 1925. It was contended in that case that this appropriation violated section 23, art. 10, of the Constitution. It was contended also by plaintiff in that case that the appropriation was without legal force and effect in that there were no funds in the state treasury at the time to pay said amount by reason of the exhaustion of the revenue provided for the current year, and that the appropriation as made violated "the cash or pay as you go" policy as alleged to be fixed by the Constitution and the law of the state, and that the expenses of the government of each year must be taken care of by revenue of that particular year; and plaintiff further urged that no fiscal year had a right to unload any of its financial burdens upon the succeeding year or years. The court, in that case, said:

"But plaintiff further contends that said act violates said section 23, art. 10. If it does, it cannot be justified or sustained, whatever be our personal inclinations. Said section 23 is quoted above. This section was found in the Constitutions of many states and had been considered by the courts of such states long before it became a part of the Constitution of Oklahoma.

"The words 'state debt' are shown by section 4, art. 10, of the Constitution, to have a fixed meaning, or to convey a definite idea of a condition; that is, it is such an obligation as the Legislature is required to provide for by levying a tax to pay the

annual interest and sinking fund to liquidate the principal at maturity. Section 23 of art. 10 authorizes such a state debt to meet casual deficits, or failure in revenue, etc., limiting the same at any one time to $400,000; and further provides the money, secured by such loans shall be used for the purposes intended.

"In the instant case, the Legislature did not attempt to create such a debt, and section 23 has no application to the situation here presented."

In that case, the court also considered the fiscal system of the municipal subdivisions of the state and the fiscal system of the state itself, showing that there was little, if any, analogy between these systems. The court in the body of the opinion said:

"An examination of the Constitution and statutes shows that there is little if any analogy between the fiscal system of the municipal subdivisions of the state and that of the sovereign itself. This is true for what might be termed an axiomatic principle of the law, to wit: That the municipal subdivisions can, in the exercise of their contractual power, do only those things which incur an expenditure of public funds, which are expressly authorized by the Constitution and statutes of the state, whereas, the rule governing the sovereign is entirely to the contrary. The sovereign speaks through its legislative body, and the legislative body determines the policy of the sovereign, which has no limitation as to expenditures, save and except those which are expressly placed on its exercise by the Constitution of the state. So we find that municipal subdivisions must have express authority, while the sovereign, to be limited, must have express limitations. We find this clear distinction pointed out in no less document than the Constitution itself."

In Re Opinion of the Judges, 38 S. D. 635, 162 N. W. 536, the Supreme Court of South Dakota rendered an opinion to the Governor of that state relative to certain acts of the Legislature of that state providing for the appointment of a rural credit board, authorizing said board to "borrow money on the good faith and credit of the state of South Dakota, to be used in lending money on real estate," authorizing the issuance of bonds or warrants in the name of state on which to borrow the money necessary to make loans, declaring that the notes and mortgages taken by the board on lands or other property acquired by it "shall be held in trust for the payment of moneys borrowed * * * and never shall be diverted to any other purpose. * * *" Such act contained no provision whatsoever for the levying of any tax to meet the payment of either the principal or interest on such bonds or warrants as the board might issue. The court said:

"We are thus presented with the question of whether a bond or warrant issued under 'H. B. 414' would create a 'debt' under the various provisions of the Constitution which we have mentioned above. At first blush it might seem as though there were no room for interpretation; that the meaning of the word 'debt' was too well established to admit of doubt in relation thereto. Webster's New International Dictionary defines 'debt' as:

" 'That which is due from one person to another, whether money, goods, or services; that which one person is bound to pay to another, or to perform for his benefit; thing owed, obligation, liability.'

"But it needs no argument to show that, if we give to the word 'debt,' as such word is used in our Constitution, the broad meaning that it has in common parlance, neither the state nor any political division thereof could perform any of the functions pertaining thereto, and, therefore, as was said in Valparaiso v. Gardner, 97 Ind. 1, 49 Am. Rep. 416:

" 'While it is our duty to yield to the words of the Constitution, still, in determining what meaning they were intended to have, it is proper to consider the * * * object it was intended to accomplish. Cooley, Const. Lim. (5th Ed.) 78, 79.'

"It has therefore been quite uniformly held that the word 'debt,' as used in such constitutional provisions, does not include any pecuniary obligation imposed by contract which, within the lawful and reasonable contemplation of the parties thereto, is to be satisfied out of the current revenues for the year, or out of some fund then within the immediate control of the corporation. In re State Warrants, 6 S. D. 518, 62 N. W. 101, 55 Am. St. Rep. 852; Appeal of the City of Erie, 91 Pa. 398; McNeal v. City of Waco, 89 Tex. 83, 33 S. W. 322; Swanson v. Ottumwa, 118 Iowa, 161, 81 N. W. 1048, 59 L. R. A. 620. What was the object intended to be accomplished by those laws which provide for the levying of taxes to speedily pay a 'debt' when contracted and provide for the limitation of the total indebtedness of a state or of a political division thereof?

"These provisions were adopted in order to counteract the tendency of the living to obtain conveniences at the expense of unborn generations; in other words, to prevent the casting upon the shoulders of tomorrow the burdens that should be borne by to-day. But only those laws should be held to be under the ban which have the

purpose and effect of accomplishing that which these provisions are intended to prevent. No law can properly come under such ban which does not intend the actual incurring of a liability and the future levying of taxes to meet the same. If the law contemplates that the liability shall be met and cared for in a manner other than by general taxation, the mere possibility that a contingency may arise under which such liability or a part thereof shall need to be met through a general tax, at least unless it is apparent that such possibility is in fact a probability, is not enough to invalidate the law."

See, also, Bates v. State Bridge Commission (W. Va.) 153 S. E. 305; In re California Toll Bridge Authority (Cal.) 298 P. 485; Eastern & Western Lumber Co. v. Patterson, Governor (Ore.) 264 P. 441; affirmed, 278 U. S. 581, 73 L. Ed. 518, 49 . Ct. 186.

There is no appropriation or pledge of any existing fund or revenue of the state for the payment of these bonds; but in view of the fact that section 8 provides that the officers having charge of any sinking fund of the state or of any county, city, town, township, or school district thereof may invest such sinking fund of the state for such city, town, township, or school district in bonds issued under the provisions of this act, we pause, for an express purpose, to contemplate this provision of the act for the guidance of such officers in dealing with such public funds. The state of Oklahoma at this time has no sinking fund except that which is being created by reason of the act of the Legislature dealing with the gasoline tax. There is nothing before the court at this time to indicate that any portion of any sinking fund of the state will be placed or invested in these dormitory bonds. The act in question provides payment for these bonds out of a special fund.

The Supreme Court of California, in construing the special fund doctrine, held as follows in Shelton v. City of Los Angeles, 206 Cal. 544, 275 P. 421, quoted in Garrett v. Swanton (Cal.) 13 P. (2d) 725:

"The overwhelming weight of judicial opinion in this country is to the effect that bonds, or other forms of obligation issued by states, cities, counties, political subdivisions, or public agencies by legislative sanction and authority, if such particular bonds or obligations are secured by and payable only from the revenues to be realized from a particular utility or property, acquired with the proceeds of the bonds or obligations, do not constitute debts of the particular state, political subdivision, or public

agency issuing them, within the definition of 'debts' as used in the constitutional provisions of the state having limitations as to the incurring of indebtedness."

Quoting further from Garrett v. Swanton, supra:

"Thus it is well established that an indebtedness or liability is incurred when by the terms of the transaction a municipality is obligated directly or indirectly to feed the special fund from general or other revenues in addition to those arising solely from the specific improvement contemplated. It also seems to be well settled, as a second limitation to the doctrine, that a municipality incurs an indebtedness or liability when by the terms of the transaction the municipality may suffer a loss if the special fund is insufficient to pay the obligation incurred. * * *

"* * * The 'special fund' doctrine was ever intended to be applied to a situation where the municipality, directly or indirectly, is or may be compelled to feed the special fund from other revenues in addition to those arising from the special improvement contemplated. Such a subterfuge, if sanctioned, would go far to effectually wipe out the purpose and intent of the constitutional provision."

If any officer in charge of any sinking fund of the state or any municipality should invest a portion of the same in these bonds, it should be with a view to a speedy replacement of the sinking fund when the occasion presents itself. If such investment of the sinking fund is made by any officer in charge of such sinking fund and a loss is incurred by reason of such investment in the bonds proposed to be issued, the taxpayers of such municipality or state will be called upon to replenish the funds so lost by such investment. It cannot be fairly said that the loss of an investment of a sinking fund is the same as the creation of an indebtedness in excess of limitations within the meaning of aforesaid constitutional provisions.

In 72 A. L. R. page 688, the annotator has announced the general rule as to an indebtedness within the meaning of the constitional or statutory limitation regarding pledges or appropriations of revenue from utility or other property, as follows:

"It is a general rule that an indebtedness, within the meaning of a constitutional or statutory debt limitation imposed upon a municipality or other political subdivision, 'cannot arise unless there is a legal, equitable, or moral obligation to pay a sum of money to another who occupies the position

of creditor and who has a legal or moral right to call upon or constrain the debtor to pay. The constraint need not, however, be by judgment and execution; when a municipal corporation voluntarily puts itself into such a position that it will forfeit large sums which it has already expended unless it makes an additional payment, it is indebted in the constitutional sense.' 19 R. C. L. 979. This rule is subject to the qualification that a debt limitation is not concerned with 'an obligation' which is payable out of a special fund if the municipality is not liable to pay the same out of its general fund should the special fund prove insufficient, and the transaction by which the indebtedntss is incurred cannot in any event deplete the general resources of the municipality." 19 R. C. L. 985.

"According to the great weight of authority, a municipality or other political subdivision does not create an indebtedness or liability, within the meaning of a constitutional or statutory debt limitation, by purchasing property to be paid for wholly out of the income or revenue to be derived from the property purchased."

The Supreme Court of Oregon, in the case of Butler v. City of Ashland, 232 P. 655, on page 657, said:

"The authorities are well nigh unanimous that, where a contract creating an indebtedness provides for a special fund with which to meet the indebtedness as the same accrues, and no general liability is thereby created against the municipality, such an indebtedness is not within the constitutional inhibition against creating a debt in excess of a fixed amount."

In Schnell v. City of Rock Island, 232 Ill. 89, 83 N. E. 462, 14 L. R. A. (N. S.) 874, the Supreme Court of Illinois said:

"A city may acquire a system of waterworks by pledging the income until it shall pay for the system, and no indebtedness is created. The same rule might apply to some definite extension of waterworks where the income of the extension could be separated and applied to payment."

An examination of many authorities cited in the brief and a research of many others conducts us to the conclusion that, so far as the special fund doctrine is concerned, the majority rule as set forth in the case of Garrett v. Swanton et al., supra, announces the correct rule that a limitation upon state or municipal indebtedness is not violated by an obligation which is payable out of a special fund, if the state or municipality is not liable to pay the same out of its general fund should the special fund prove to be insufficient, and the transaction by which the indebtedness is incurred can-

not in any event deplete the resources of the state or the municipality, limited to the two exceptions noted therein.

In the instant case, no inhibition of the statute or the Constitution has been called to our attention against the issuance of said bonds. It is wholly within the discretion of the constituted authority to proceed to carry out the project as authorized by the legislative enactment contained in said chapter 34; at this time we have no right to anticipate that public officers will not perform their official duties as required by law. There is nothing before us to indicate, except under the permissive authority of the act in question, that there will be any sinking fund of the state or the sinking fund of any political subdivision invested in the proposed dormitory bonds. We have made special observance of the investment of such sinking funds in order that these officers may ponder and reflect in the event of the loss in the investment of any fund belonging to the state or its political subdivision provided for in said chapter 34. In the event of loss by reason of such transaction, there is no escape from the certain thought that the taxpayers of the state or the political subdivision must at all times stand ready to feed or replace the fund so lost. This is the general rule applicable to the investment of any sinking fund.

The purchasers of these bonds proposed to be issued will investigate the project lying behind their issuance. They have before them the project, the hazard, the rate of interest, commerciability, and desirability of such an investment. The act is included within the bonds as fully as though written therein. The purchasers must look to the bonds themselves, and not to the state or any political subdivision thereof. In re California Toll Bridge Authority (Cal.) 298 P. 485, supra.

After a careful review of the issues herein presented, we conclude that the trial court properly sustained the demurrer to the petition.

Judgment affirmed.

OSBORN, BAYLESS, BUSBY, and WELCH, JJ., concur. ANDREWS, J., concurs in conclusion. RILEY, C. J., CULLISON, V. C. J., and SWINDALL, J., dissent.

---

RILEY, C. J. (dissenting). Chapter 34, art. 6, S. L. 1931, purports to authorize the issuance and sale of "Oklahoma Agricultural

and Mechanical College Dormitory Bonds" in the amount of $450,000, the proceeds of which are to be used for the construction of dormitories on the campus of the A. & M. College at Stillwater.

Statutory provision is sought to be made for the interest and principal of the bonds by the creation of a fund to consist of the net profits derived from the rentals of the rooms of the dormitories. There is no provision, however, that the principal and interest are to be paid exclusively from said profits. These bonds are to be tax exempt; to be signed and issued by the State Auditor, upon application of the State Board of Agriculture, with the approval of the Governor. They are to be registered by the State Treasurer, and examined and approved by the Attorney General. The proceeds are to be placed in the state treasury to be expended upon warrants issued by the State Auditor.

Under the provisions of section 8 of the act, any officer having charge of any sinking fund of the state, county, city, town, township, or school district of the state of Oklahoma is authorized to invest such sinking fund in said bonds.

A decisive question presented is whether these bonds will constitute an obligation of the state. If so, their issuance and sale are specifically prohibited by section 23, art. 10, Constitution of Oklahoma:

"The state may * * * contract debts, but such debts, direct and contingent, singly or in the aggregate, shall not, at any time, exceed $400,000. * * *"

If these bonds, when issued, will constitute a debt of the state in the amount sought to be issued, they are prohibited by the highest of mandates and void, and, in that event, issuance and sale of the bonds should be enjoined.

The A. & M. College is an institution corporate, created and existing under the laws of this state. Section 143, Stats. 1893, sec. 7244, O. S. 1931. But the corporation has never been granted power to sue or to be sued. The status of the corporation, and property belonging to it, in relation to the state of Oklahoma, is substantially the same at this instant as it was prior to statehood in relation to the territory of Oklahoma. This status was definitely defined in the decision of Oklahoma Agricultural & Mechanical College v. Willis, 6 Okla. 593, 52 P. 921. Therein it was determined:

"The Agricultural and Mechanical College which is strictly a public or quasi corporation created and existing under and by virtue of the laws of the territory of Oklahoma, cannot, in the absence of express statutory authority therefor, be sued, and no such authority exists in this territory, hence said institution cannot be sued."

It was further held:

"That defendant is a public corporation under the laws of the territory of Oklahoma, there can be no doubt."

Public corporations are such as are founded by the government for public purposes and where the whole interests belong to the government. Concurring opinion: Dartmouth College Case, 4 Wheat. (U. S.) 518.

Such is the recognized rule in this jurisdiction.

"The obligations of the defendant in the case at bar are the obligations of the territory, * * * and to the territory its creditors must look for payment. * * *" Oklahoma A. & M. College v. Willis, supra.

I have omitted from the above quotation the phrase "where there is no fund appropriated for the payment of their claims" for the reason that where such a situation exists, where there is such a fund, it is settled and stated in the cited case that mandamus is the remedy of a creditor as against the officer (not the public corporation), whose duty it is to audit and allow a just claim against a fund. Such an action is not a suit against the public corporation nor against the state.

The reason underlying the rule that an action may not be maintained against a state or a public corporation, without express provisions of law allowing the same, is the fact that the sovereign is one of the contracting parties. The public corporation is a portion of the state government. As against the sovereign, there are no remedies except such as the sovereign accords. The sovereign may not be annoyed, interrupted, impeded, or destroyed by her creatures, either instrumentalities of government, such as courts, or citizens. Her creditors must rely solely upon her good faith as to time, mode, and measure of payment.

It is futile to waste time to argue that public educational institutions are a part of the sovereignty—some things are too plain to require argument.

Now, if the state is one of the contracting parties, if this public corporation is a part of the state then obligations of this public corporation are obligations of the state.

The contrary view sustains "the special fund theory," which is to say that the obligation so elaborately to be expressed in these proposed bonds is on nobody, but only of the special fund itself, derived from the net profits expected from the rent of bedchambers to be constructed within these dormitories, which of necessity is derived from property to belong to the state. Suffice it to say the special fund theory has been definitely and most recently rejected by this court. Zackary v. City of Wagoner, 146 Okla. 268, 22 P. 345. And in consideration of practically all the cases supporting the rejected rule: Winston v. City of Spokane, 12 Wash. 524, 41 P. 888; Faulkner v. City of Seattle, 19 Wash. 320, 53 P. 365; Joliet v. Alexander, 194 Ill. 457, 62 N. E. 861; East Moline v. Pope, 224 Ill. 386, 79 N. E. 587, and other cases. Therein we said:

"We are not unmindful of the rule followed in some jurisdictions that the purchase of property does not create an indebtedness if the purchase price is to be paid out of the income therefrom, * * * but we cannot follow such holding. * * * The reasoning in support thereof is the ingenious argument by which such attempts have ever been supported. * * * The agreement to pay * * * creates an indebtedness no matter from what source the funds are to be derived. * * *"

Can words or rule be plainer? To further paraphrase: Section 23, art. 10, supra, "contain nothing that limits (their) application to indebtedness to be paid from funds derived from an ad valorem tax levy. They (the provisions limiting debts) are general in their terms and they will be applied by this court to all manner of indebtedness, no matter how created or from what source the indebtedness is to be paid. As well might a public corporation (municipality) contend that an indebtedness was not an indebtedness because it was to be paid from receipts from * * * other sources of income. * * * We cannot give our approval to such theory of law." Can logic be sounder?

The statement contained in the majority opinion in reference to the decision in the City of Wagoner Case, that "a portion of the corpus of the lighting system of the city created by an ad valorem tax was utilized to feed the special fund provided for the payment of the Diesel engines," is not exactly borne out by the record. Therein the net profit derived from the savings contemplated by the use of property so sought to be purchased was the special fund pledged to the payment of the debt; consequently the income created by the corpus of the plant owned by the city was merely the base from which the savings contemplated by modern machinery was the special fund sought to be pledged to pay for the Diesel engine. Just as in the instant case the net profits derived from use of the dormitories resting on state-owned land is the fund pledged for payment of the debt.

These bonds are to be tax exempt securities. Does not that provision of law contemplate that they are obligations of the state or one of its indivisible counterparts? Surely specific exemption from tax of a private corporation would not be sustained. Was it ever contemplated that a board of control of any public corporation, such as a state educational institution, would possess power to become involved in debt without limitation, or that so-called bonds masquerading under the guise of state securities could depreciate the good faith and credit of the state, or one of its creatures whose interests, burdens, and obligations are in fact its own? I think not. Unquestionably, these buildings when erected will become the property of the state, for they are to be located upon state-owned land. The bondholders cannot maintain an action against the college or against the state to enforce the obligation. Nor, under the rule heretofore adopted by this court, are the obligations of the bonds limited to special fund. Hence the obligation is upon the state, as much as it could ever be, to supplement the inadequacy of the special fund by general appropriation. It is a state debt.

Inadequacy of the special fund pledged is not assumed. The public record discloses, and it is commonly known, that other dormitory bonds have heretofore been issued by the authorities of the state, and that similar special fund revenues have failed by from $6,000 to $9,000 annually to provide a sufficient fund to pay the annual accruals thereon.

It may be inqired, with some reason, why should the public interest be concerned with this loss to investors? The answer is contained in section 8 of the act. Just as water seeks its level, so will these pseudo securities (which might in all seriousness be designated bedroom bonds) seek the investment of the least wary, who is not banker or the financier, but the elected public servant who is authorized by the act to invest therein, not his own money, but the money of the sinking fund of the government, intrusted to his care.

These are what are commonly known to the vernacular as "wildcat bonds." Shortly after the World War this state experienced an

epidemic in such public finance, including the investment of sinking funds in such wildcat bonds. Apparently again the cycle is reached.

Assuming, then, the investment of sinking funds of state and municipal subdivisions, authorized by the act, in these bonds, assuming, then, the inadequacy of the special fund pledged to meet the obligation of the bond (judges cannot be blind to that which everyone knows); or, as an alternative, assuming the general obligation of the bonds in view of this court vigorous denial of the special fund theory, the inevitable result will be that the state and municipal subdivision will be obliged to replenish the failed sinking fund investments in these bonds.

The majority view is:

"If such investment of the sinking fund is made by any officer in charge of such sinking fund and a loss is incurred by reason of such investment in the bonds proposed to be issued, the taxpayers of such municipality or state will be called upon to replenish the fund so lost by such investment.

"It cannot be fairly said that the loss of an investment of a sinking fund is the same as the creation of an indebtedness in excess of limitations within the meaning of aforesaid constitutional provisions."

I proclaim with all the power attained by words within my command that this statement is fallacious, refuted by its own words, unsupported by authorities, subject and likely to being damned by the designated victim and butt of its involved words, the overburdened, unsuspecting taxpayer.

It is to say:

(1) Investment of public sinking funds in the bonds is authorized.

(2) If loss occurs by reason of the inadequacy of the specific fund pledged, the taxpayer must pay the loss by taxation.

(3) But this taxation necessary with which to pay the loss is not a debt.

The words used indicate that the taxpayer will be obliged to "replenish the fund" lost. The result is that he pays doubly pro tanto the obligation for which the sinking fund was created.

In determining the question of the constitutionality of an act of the Legislature, the test is not what has been done under it, but what the law authorizes to be done. 12 C. J. 786; 1 Sutherland Stat. Const., par. 107; State ex rel. Holliday v. O'Leary (Mont.) 115 P. 204.

The palpable racket authorized by section 8 of the act, i e., the investment of public sinking funds in these bonds—a species of diversion of a public sinking fund into a building fund—contrary to the provision of sections 4, 17, and 19, of art. 10, Constitution of Oklahoma, should impel this court to declare at least that portion of the act unconstitutional and void.